15363

MASONIC TEMPLE, INC., ET AL. v. EBERT
(18 S. E. (2d), 584)

8 .

February, 1941.

*Messrs. Haynsworth & Haynsworth,* of Greenville, and *Messrs. Blackwell, Sullivan & Wilson,* of Laurens, for appellant,

*Mr. O. L. Long,* of Laurens, and *Mr. Jno. W. Crews,* of Columbia, for respondents,

Counsel for appellant, in reply brief,

February 2, 1942.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE E. H. HENDERSON.

The plaintiff, Masonic Temple, Incorporated, is the owner of a lot and building in the Town of Clinton, and this is substantially all of its property.

The officers of the company, on October 29, 1938, gave the plaintiff, W. P. Baldwin, a written instrument called an option, whereby he was constituted an agent to sell the property on the terms. there set forth. In an endeavor to dispose of the property the selling agent called upon the defendant, R. E. Ebert, and after several conversations the defendant gave Baldwin $100.00 for a ten-day option on the premises. On January 12, 1939, they met at Clinton and went to the office of R. W. Wade, an attorney, now deceased, for the purpose of having a contract drawn for the sale of the lot and building. Mr. Wade stated that he represented the plaintiff corporation, but it was agreed that this would not interfere with his drawing the contract and representing the defendant in the examination of the title.

B. H. Boyd, the president of the company, was then called to Mr. Wade's office, and an agreement was prepared by Mr. Wade for the sale of the property to the defendant for the sum of $27,000.00. Another payment of $100.00 was then made to Baldwin by the defendant, and Ebert gave the plaintiff company a check for $1,300.00, the balance of $25,-500.00 to be paid on or before February 11, 1939, upon delivery of a deed in fee simple, free of all liens. It was pro-

vided in the contract that in the event the plaintiff corporation should fail to deliver the deed the amount paid by Ebert should be refunded.

Prior to the execution of the instrument Mr. Wade stated that before he would be willing to approve the title he desired a resolution of the stockholders of the corporation authorizing the sale, and Mr. Ebert consented to this arrangement. The instrument was then signed by the president and secretary on behalf of the corporation, and by Mr. Ebert personally. Mr. Baldwin, at the foot of the paper, acknowledged receipt of the $200.00 and agreed to the terms of the contract.

Several days after the instrument had been signed the defendant learned that the income from the rents was much less than had been represented to him, and the taxes and fire insurance considerably more. He immediately went to the office of Mr. Wade, and told him that he had found these discrepancies, that he was unwilling to go forward with the transaction, and wanted it called off. He also discussed the matter of the discrepancies with Baldwin.

The defendant, on January 18, 1939, stopped payment of the $1,300.00 check, which had not been deposited promptly, and on January 21, 1939, wrote the Masonic Temple, Incorporated, a letter stating that he was anxious to have the contract cancelled on account of the income being less than he had understood it to be. The plaintiff company received the letter on January 23, 1939.

A special meeting of the stockholder of the corporation was held on January 24, 1939, for the purpose of considering and passing upon the sale of the premises. Mr. Boyd, the president, informed the stockholders that the officers had made a contract with the defendant, but that he had received a letter from him requesting that the agreement be cancelled, and reported to them that payment had been stopped on the $1,300.00 check. It was then moved and carried that the sale to the defendant be approved, and the president and secretary of the company were authorized and

empowered to execute a deed conveying the property to the defendant upon payment of the purchase price.

A deed was executed on February 6, 1939, and was tendered the defendant. He refused to accept it, and on June 14, 1939, this action was commenced by Masonic Temple, Incorporated, and Baldwin for the specific performance of the contract.

The defendant, Ebert, in his answer sets up two defenses: That the stockholders of the Masonic Temple had not authorized the execution of such a contract of sale by its officers, and that prior to ratification by the stockholders he had notified the plaintiff company that he was withdrawing the offer set forth in the contract; and that the contract had been obtained by the misrepresentation of material facts by the plaintiff, Baldwin.

The cause was referred to Mr. R. E. Babb, as special Referee, who filed a report with his findings of fact; and he concluded from the facts that there was no unqualified withdrawal from the contract by Ebert, such as would release him from the terms of the agreement; that the defendant by his conduct waived any legal right he may have had to withdraw from the transaction before ratification by the stockholders; and that the defendant should be estopped to claim that he had a right to withdraw; and as a consequence held that there was a binding contract between the parties.

The special Referee also concluded from the facts found that the defendant had failed to avail himself of the means at hand to ascertain the true facts, and cannot be heard to say that he was deceived by the misrepresentations.

Upon exceptions by the defendant, his Honor, the Circuit Judge, held that the special Referee had correctly decided the issues of law and fact, the report was confirmed in all particulars, and it was held that the plaintiffs were entitled to specific performance of the contract. Judge Dennis further held that there was no fraud; that the defendant did not rely upon the misrepresentations; and that he was not misled by them.

Though there are twenty-one exceptions to the circuit decree, we think that the appeal may be determined by the answer to two questions: Was there ever a binding contract between the parties? Were there such misrepresentations on the part of the plaintiffs as would warrant a Court of equity in refusing specific performance?

First, Was there a binding contract?

When the contract was executed on January 12, 1939, it had not been authorized by the stockholders of the corporation. Section 7705 of the Code provides that a corporation such as this one, with the consent of the holders of two-thirds of the total number of shares outstanding, may sell all or substantially all of its property, and that before such sale the consent shall be obtained at a meeting of the stockholders.

To constitute a valid contract of sale in the circumstances here the consent of the stockholders was necessary. Until that consent was given, the signing of the contract by Ebert was only in the nature of an offer, which could be made effective by the acceptance of the stockholders. It is clear, in the ordinary case, that an offer may be withdrawn at any time before its acceptance, by notice given to that effect to the other party. So here, we think, at any time before the assent of the stockholders, the defendant had the legal right to withdraw his offer by properly notifying the plaintiff corporation of his intention to do so.

Though the facts in the case of *Finklea v. Carolina Farms Co.*, 196 S. C., 466, 13 S. E. (2d), 596, 598, are different, the statement of principles of law there announced throws light upon the present situation. In that case G. T. Walker submitted an offer to the president of the corporation of $1,000.00 for an option to purchase all of the lands of the company. At a meeting of the stockholders called to consider the proposal, consent of the holders of two-thirds of the shares was not obtained. It was declared by the Court:

"Doubtless Mr. Walker made his offer in the utmost good faith, but he was bound to realize, not only because he was presumed to know the requirements of the law, but because he was definitely put on notice that his offer was subject to the approval of the stockholders; and of course in that case he ran the risk of someone's making a higher and better offer, in which event he could not expect his offer to be accepted. And there can be no contract unless there is both an offer and an acceptance. Hence in the case at bar there was no contract.

"The fundamental basis of a suit for specific performance is that there is a contract between the parties.

   *   *   *

"And it will be borne in mind here that the defendant is a corporation, and the record shows that the property in question constituted all of its real estate and at least substantially all of its assets. Clearly then if the officers of the company had attempted to sell the property without the approval of the stockholders any option or conveyance would have been ineffective."

And the following was quoted from 58 C. J., 945, 946: "Specific performance of a contract of a corporation may be decreed in a proper case, but not where the contract * * * was entered into on behalf of the corporation by a particular officer without proper authorization, ratification, or approval."

Many authorities hold that prior to ratification by the principal, the other party to the contract has a right to withdraw.

In Fletcher's Cyclopedia of the Law of Private Corporations, Volume 2, Section 765, we find this statement: "It has been held in England, and there is dictum to the same effect in this country in some of the cases, that where a person assumes to enter into a contract for another without authority, the other party to the contract cannot withdraw so as to prevent a subsequent ratification by the person for whom the pretended agent acts. But this view is contrary to

the settled principles of law and of the weight of authority. Until the principal ratifies the contract there is no mutuality of consideration for the other party's promise, and it follows that he may withdraw at any time before the principal becomes bound. A corporation, therefore, cannot by ratification of a contract made by an officer or agent without authority, render it binding on the other party if the latter has withdrawn and given notice thereof, before the ratification."

At 2 C. J. S., Agency, § 64, page 1142, it is said: "The general rule, however, is that until ratification the third person is free to withdraw from the contract, and if he does not do so the principal's ratification cures the defect in authority and the third person becomes thereafter bound as though the authority had been previously conferred, and he cannot thereafter withdraw except on grounds entitling him to a rescission. At all events, under the general rule stated if before the principal elects whether he will ratify, the other party signifies his intention not to be bound, there can be no ratification."

We find, at 13 American Jurisprudence, 929, Section 975: "In this country it is generally agreed, however, that the third person dealing with the authorized officer or agent of a corporation may withdraw from the transaction before it becomes mutually binding by virtue of its ratification."

In Restatement of the Law of Agency, Volume 1, page 213, it is said:

"To constitute ratification, the affirmance of a transaction must be before the third person has manifested his withdrawal from it either to the purported principal or to the agent, and before the offer of agreement has otherwise terminated or been discharged.

"Comment:

"a. Withdrawal by third person. Until affirmance, the relationship of the third person to the purported principal is similar to that of an offeror and an offeree. Before such time,

therefore, the third person is free to withdraw either because he discovers that the principal has not authorized the transaction or for any other reason. This is so although the agent has not represented that he is authorized, and although the other party has contracted with the agent that he will not withdraw."

In a case in our State, decided in 1832, *Breithaupt v. Thurmond*, 37 S. C. L., 216, 3 Rich., 216, the Court said: "I am not disposed to question that the agreement made with the defendant by B. McKennie, as the agent of C. Breithaupt, trustee, would not have been binding on either party until ratified and confirmed by Breithaupt. If, therefore, Breithaupt had refused to comply with the contract, or if, before he had assented to it, defendant had refused to abide by it, he could not have been compelled to do so."

Before ratification by the stockholders, and while the contract thus remains an executory one, we do not think that Section 7705 of the Code is for the benefit of the stockholders only, and to be invoked only by them. When a contract is executed and a deed delivered only the stockholders would have a right to avoid the deed made by the officers without compliance with the provisions of this section. So long, however, as the sale contract remains executory it is governed by the general law as to offer, acceptance, and ratification. This is clearly shown by the fact that before ratification by the stockholders the corporation could not compel a purchaser to accept a deed; and it is borne out by the reasoning in the case of *Finklea v. Carolina Farms Co.*, above.

The resolution of the stockholders was passed on January 24, 1939, and so we come to the question, Did the defendant give notice of withdrawal before that time?

The letter which defendant wrote on January 21, 1939, is as follows:

"Referring to our contract whereby you were to sell me the Masonic Temple Building. I am anxious to have you

cancel this contract for me, owing to it having less income than I understood it had.

"I will be happy to reimburse the Masonic Temple, Inc., for any expenses it may have had in connection with this contract."

This letter, we think, expressed the unwillingness of the defendant to proceed further with the transaction.

It is clear that the law does not require a notice of withdrawal of an offer to be in any particular form. It is not necessary that the words "revoke" or "withdraw" be used.

In addition to the letter, the defendant unequivocally expressed his unwillingness to proceed further, in verbal statements to Mr. Wade, the attorney for the seller. Also, the stopping of payment of the $1,300.00 check, prior to January 24, 1939, was an unequivocal act, clearly showing an intention on the part of the defendant to withdraw. Such withdrawal may be evidenced by conduct, as well as by words.

We have, from restatement of the law of agency, Section 88, the following: "Conduct manifesting to the agent or the principal that the third person no longer consents to the transaction, constitutes a withdrawal."

And at 17 C. J. S., Contracts, § 50, page 398: "Formal notice, however, is not always necessary, it being sufficient that the person making the offer does some act inconsistent with it * * * and that the person to whom the offer was made has knowledge of such act."

The notice of withdrawal of the offer was communicated to the plaintiffs before the stockholders acted.

It follows that the attempted ratification on January 24, 1939, was ineffective.

We do not think that it can be held, under the facts here, that the defendant waived his right to withdraw.

Waiver, as has often been declared, is the voluntary relinquishment of a known right. Certainly at the time Ebert signed the contract he did not have knowledge of an impor-

tant fact, the falsity of the statements made to him, and cannot be said to have relinquished his right to protection against such unknown misrepresentations.

We think, too, that the essential element that a relinquishment be intentional, is lacking. The contract here is clearly not a right given to the seller, until February 11, 1939, to carry out the option, if the stockholders should so agree, binding Ebert to refrain from exercising his legal right to withdraw in the meantime. On the contrary it is an agreement for a present sale and purchase. It provides that the seller "has and does hereby contract and agree to sell and convey," and the purchaser "hereby agrees to purchase." The date, February 11, 1939, was inserted to give the parties the necessary time to complete the formalities of preparing the papers and examining the title, matters usually incident to a real estate transaction.

Nor do we think that the defendant is estopped to withdraw his offer by reason of Baldwin being led to cease his efforts to sell the property to others. Equitable estoppel rests upon misrepresentation by the person sought to be estopped. We hardly think that under the facts of this case the doctrine could be invoked in favor of Baldwin, who himself made the real misrepresentations. At 21 Corpus Juris, 1138, it is said: "It is therefore essential that the party claiming the benefit of the estoppel should have proceeded in good faith."

And estoppel does not arise from causing the Masonic Temple Company to go to the trouble of calling a stockholders' meeting, with the consequent expense. Ebert did not require the ratification of the stockholders; that was a requirement of the law. The nominal expense of calling the meeting was not of such substantial character as would bring about an estoppel, particularly when the defendant offered to reimburse the plaintiff for it.

Our conclusion, then, is that there was never a binding contract between the parties.

Although this holding is sufficient to dispose of the appeal, since it necessarily precludes specific performance, we shall proceed to pass upon the remaining exceptions, and to consider the question, Were there such misrepresentations on the part of the plaintiffs as would warrant a Court of equity in refusing specific performance?

For this purpose let us examine the evidence on this feature of the case.

Mr. Ebert is a resident of Columbia. When Baldwin first talked with him he exhibited a statement given him by the treasurer of the plaintiff corporation. This statement correctly set forth that the rent from the theater amounted to $1,320.00 annually; that the stores rented for $25.00 monthly; and that the cost of the lot and building, in 1921, was $42,673.00.

Baldwin made no progress at this time, but the defendant agreed to meet him at Clinton and to inspect the property. In the latter part of 1938, defendant met Baldwin at Clinton, and Baldwin gave him a memorandum which he had prepared. This represented that the rentals being derived from the property were as follows: Theater, $1,320.00; a club room, $180.00; store rooms, $1,200.00; Chamber of Commerce, $200.00; church, $180.00; lodge room, $600.00; total $3,680.00. The statement also showed that the taxes and insurance amounted to $300.00, and that the net income was $3,380.00; and a calculation was included in the statement showing an income of 12 per cent. on the investment.

The defendant's brother-in-law questioned the income represented to be paid by the lodge room, and Mr. Baldwin stated that there were several lodges using the building, the Masons, the Eastern Stars, the Junior Order, the Red Men, and the Woodmen, each paying $10.00 per month. There were two store rooms in the building, one of which was cut into separate apartments. Mr. Baldwin represented that there were four occupants of these store rooms, paying $25.00 per month each.

The defendant talked with the lessee of the theater, and confirmed his rent. He also saw two of the tenants of the store rooms, and confirmed the fact that they were paying $25.00 per month each. No further investigation was made by the defendant to verify the rents paid by the other tenants, whether the lodge rooms were being used, or as to the amount of the taxes and insurance.

It was after this that the defendant paid Baldwin the first $100.00 for the ten-day option, at which time Mr. Baldwin again showed him the statement of the treasurer, but did not leave it with him.

Five days after the instrument in question had been signed the defendant discovered that the rents received from all the tenants from February 1, 1938, to January 18, 1939, were $1,887.00 for about eleven months. There was no income at all from the lodges. The taxes were $342.72. The fire insurance premiums were $392.60. The rents for 1937 totalled $1,895.50.

It was then that the defendant went to Mr. Wade, and told him that he was unwilling to go on with the purchase.

It is important to note that the special Referee found as a fact that the misrepresentations were made. No exceptions were taken to these findings; the report of the Referee was confirmed by the Circuit Judge; and so these are established facts in the case.

Should equity require specific performance, in view of these misrepresentations?

The special Referee did not find as a fact that the defendant was not misled by the misrepresentations, or that he did not rely upon them; but he based the decision on his conclusion of law that the defendant should not be permitted to take advantage of his own neglect in failing to use the means of knowledge within his reach, and that he must impute any loss or injury to his own indiscretion.

We think it is clearly shown by the evidence that the misrepresentations operated to induce the defendant to enter

into the contract; that he relied upon and was misled by them. The special Referee was of opinion that he had the duty of making more complete investigation.

We should remember, first, that it was the duty of the defendant to make only such investigation as a reasonable man would have made in the circumstances. He did visit several of the tenants, and in each instance found the rent to be as represented.

The fundamental consideration, however, is to keep in mind the principles governing specific performance, and to distinguish it from other remedies.

It is well settled that specific performance is not a matter of absolute right, but rests in the sound discretion of the Court, guided by established principles, and is exercised by a consideration of all the circumstances of each particular case. A Court of Equity will not decree specific performance unless the contract is fair, just, and equitable, nor if it fails to express the true agreement of the parties by reason of fraud, accident, or mistake.

At 58 C. J., 965, it is said: "As a general rule, if defendant has been induced to make the contract by reason of any material misrepresentation on the part of plaintiff or his agent, specific performance will be denied, whether the misrepresentation was willful and intended, or made innocently or with an honest belief in its truth. * * * "

And at 58 C. J., 967, we find: " * * * and if a fraudulent misrepresentation has in fact been relied on, specific performance will generally be denied, even though there existed and were accessible to defendant the means and opportunity of detecting the truth by an exercise of ordinary prudence, or although defendant has gone so far as to make a partial investigation without discovering the truth. * * * "

Equity may deny specific performance because of misrepresentations in procuring a contract, when it would not rescind the agreement at the instance of the injured party.

In the case of *Barksdale v. Payne,* 12 S. C. Eq., 174, Riley's Eq., 174, the Court declared: "It is not necessary that the defects of a contract be sufficient to rescind it. That is not the application now made by the defendant. The.Court may refuse to decree a performance, when it would not rescind. And the authorities are too clear to admit of a doubt, that whenever there is a concealment, or misrepresentation of material facts, whether designedly or not, or a material breach of contract by the other party, whereby the reasonable expectations and intentions of the party sought to be bound, had been frustrated, or his remedies impaired, equity will not enforce the contract against him."

Here the property was bought for investment purposes, and instead of the rentals being $3,680.00 they were less than $2,000.00; instead of the taxes and insurance being $300.00, they were over $700.00; instead of the return on the investment being about twelve per cent., it was about five per cent.

It is stated in the case of *Gasque v. Small,* 21 S. C. Eq., 72, 2 Strob. Eq., 72, that: "There is a material difference between a party who seeks to rescind and one who seeks to enforce an agreement, as it requires much stronger evidence to effect the former, than will be sufficient to enable the defendant to resist the latter."

In laying very great weight upon the failure of Ebert to make a more complete investigation, we think that the special Referee and the learned Circuit Judge have applied the principles relating to rescission of contracts, rather than those governing specific performance. It is true, however, that Ebert is not seeking a rescission of a contract; he is defending an action for specific performance brought by the seller. Even if we assume that if the defendant had sought a rescission of the contract the Court would have refused it, it does not necessarily follow that specific performance should be granted.

■ It is not so much a question of the diligence of Ebert in investigating the representations, as it is a proper application of the ancient maxim that he who comes into equity must come with clean hands. For many years it has been held that the Court of Equity will refuse to lend its aid to one who has been guilty of inequitable conduct in the subject-matter. We think that this maxim aptly fits the present case. The equitable status of the plaintiffs is the primary consideration.

■ We think that there were such misrepresentations on the part of the plaintiff, ·Baldwin, as would make it inequitable for specific performance to be granted.

It is true that the false representations were not made by the officers of the company, or by Mr. Wade; they knew nothing of them. They were, however, made by the company's selling agent, Baldwin, and it would not be equitable to allow the principal to have the advantage resulting from such misrepresentations.

The facts in the case of *Mobley v. Quattlebaum,* 101 S. C., 221, 85 S. E., 585, 589, are quite different in many respects from those in the present action. The main difference is that in the *Mobley case* the Court said that "throughout the whole case there is nothing to show that Mobley made any representations that were calculated to mislead or deceive the defendant to his injury," whereas in the present action the making of the misrepresentations is undisputed.

■ We are mindful of the great weight which is to be given to findings of fact by the Referee, concurred in by the Circuit Judge. That has been done here, and the facts so concurrently found have been regarded by us as firmly established. The rule, however, does not prevent a review of the conclusions of law based upon such facts, nor a review of the application of principles of law to the facts as found.

It is our conclusion that the judgment should be reversed.

Judgment reversed.

Mr. Chief Justice Bonham and Messrs. Associate Justices Baker, Fishburne and Stukes concur.