16534

FLOWERS v. ROBERTS
(66 S. E. (2d) 612)

*Messrs. James B. Dixon* and *J. Ralph Gasque,* of Marion, and *McEachin, Townsend & Zeigler,* of Florence, for *Appellant,*

*Messrs. Woods & Woods,* of Marion, *for Respondent,*

*Mr. James B. Dixon,* of Marion, *for Appellant, in Reply,*

August 20, 1951.

OXNER, Justice.

This is an appeal by Marion Roberts from an order adjudging that his aunt, Mrs. Ethel E. Flowers, respondent here and plaintiff below, has fee simple title to, and is entitled to the immediate and exclusive possession of, a house and lot in the Town of Marion, and requiring the said Marion Roberts to vacate said property and deliver possession thereof to respondent.

The issues involved can better be understood after the facts leading up to this controversy are stated.

Respondent, now in her late sixties, had three brothers and one sister. All of them were born on a farm about ten miles north of the Town of Marion. One of the brothers, Frank Monroe Roberts, left home early in life and finally entered the lumber business in Washington, D. C., where he was later joined by another brother, Maxwell E. Roberts. They were very successful in this enterprise. The remaining brother, Enos R. Roberts, who is the father of appellant,

continued to reside in Marion County. The sister was an invalid and never married. Respondent married John Eastman Flowers.

In 1930, or shortly prior thereto, the house in which respondent and her husband were living, located on a farm in Marion County, was destroyed by fire. They then moved to Marion and rented a house. In 1930 Frank Monroe Roberts purchased a lot in Marion and erected a house thereon at a cost of $9,000.00. This was done in order to provide a home in which respondent could live and take care of her father, then about eighty years old, and her afflicted sister, about forty-five years of age. Soon after the house was built, respondent and her husband moved in and were shortly thereafter joined by her father and invalid sister. Except for occasional visits to relatives, the father lived in this home until his death in 1933. The sister continued to reside there, except when in the hospital, until her death in 1938. This left respondent and her husband, who had no children, as the sole occupants of the house. Her husband died on March 19, 1947, Frank Monroe Roberts, who entertained an unusually warm affection for his sister, apparently became much concerned about her living alone and sought to find some suitable person to live with her. He finally determined, with the approval of respondent, to ask appellant and his family, consisting of his wife and three small children, to live with respondent. The proposal by Frank Monroe Roberts to appellant, his nephew, then about thirty years of age, was made in a lengthy letter which, omitting immaterial portions, was as follows:

"Washington D. C.,
March 27, 1947

"Dear Marion:

"Since Eastman's illness last fall it has been very much in my mind as to what could be done with your Aunt Ethel and just why it occurred to me that you could possibly be of more help to her than anyone else, I do not know. How-

ever, I did not mention this to anyone at any time, but was very glad to know upon Maxcy's return to Washington that she had expressed to him the fact that she would rather 'have you and your family to live with her than anyone she knew. Now naturally this speaks very, well for you and Maxcy tells me you were very helpful in handling matters last week.

"Now I am sure Ethel will be very glad to enter into an agreement with you for you and your family to live with her and I know satisfactory living arrangements can be worked out by you. The layout of the house would give you and your family almost exclusive living quarters with the exception, of course, of the cooking and eating arrangement. In other words, your privacy and hers would not be interferred with.

"This, I will admit is some undertaking and it is not proposed by me that you take on such a responsibility without some thought or promise of reward.

\* \* \*

"I am ready to promise you that in the event you go there and take care of your Aunt Ethel; make a good comfortable home for her and see to her needs, I will provide in my will that you and your heirs are to inherit this property; that is to say, the house and sufficient ground for a comfortable lot. \* \* \*

"Now as to taking care of Ethel, I do not mean that you are to pay her expenses as she will be self-supporting at all time, but heating arrangements, electricity, food and such other items as are incurred in the expense of operating the home should be divided between you, on an equitable basis. \* \* \* As to her personal bills, she will have to look out for them herself and need in no way concern you.

\* \* \*

"She, of course, must have someone to live with her and you know and I know she is not a hard person to get along with. From what I understand of you, you are not either and if you go there with the idea of being agreeable and making yourself agreeable, I am sure she will enter into the spirit and there should be no friction.

"This I think would be some attraction to you because it will relieve you of the burden of paying rent possibly for several years or attempting to buy property at a very exorbitant price.  *  *  *  So in addition to your being relieved of rent, you will have the assurance of a home for life and something which you and your heirs will be able to convey provided, of course, you outlive her and it is reasonable to suppose you will.

*  *  *

"So far as furniture is concerned, you would be at liberty to take anything you want which you now possess or you can use all or any part of the furniture which is there. That which might be in your way, we will arrange to dispose of.

*  *  *

"I feel as though this is a rather generous offer and I hope you will give it due consideration and let me have your decision as early as you possibly can. I am notifying Ethel I am making you this proposition and am asking her to ask you to come around and talk the matter over with her.

"If there are other matters which I have not mentioned and which you would like to have further information on which I can furnish, be sure to call on me for it.

"With very best wishes, I am sincerely,

"Your Uncle, Monroe."

An acceptance of the foregoing offer was duly communicated to Mr. Roberts, who thereupon wrote appellant as follows:

Washington, D. C.
April 18, 1947.

"Dear Marion:

"I understand that you accept the proposition I made you several days ago and expect to move in this week. I am very glad that you could see your way clear to accept the proposition and I certainly hope that you will get along all right.

"Now, Marion, the only thing for you and your family to do is to make up your mind to get along and if any differ-

ences arise, which they are bound to, simply have them ironed out at once. Try to have a thorough understanding about everything and if certain things arise which you had not had an understanding about, then bring it out into the open and have an understanding about it.

\* \* \*

"You are moving in there with the understanding that the property will become yours. Such being the case, you are supposed to take an interest in everything just the same as if it were yours today and I would suggest that you make plans accordingly.

\* \* \*

"With best wishes, I am,

"Sincerely yours,
Monroe."

Pursuant to the above agreement, appellant and his family moved into the home of respondent on April 14, 1947. On August 21, 1947, approximately four months later, Frank Monroe Roberts died without making the agreed testamentary provision. He left a will dated October 10, 1942, wherein the property in controversy passed in fee simple under the residuary clause to respondent and her two brothers, Enos R. Roberts and Maxwell E. Roberts. It seems to be conceded that the failure of the testator to carry out the agreement was the result of pure inadvertence. Maxwell E. Roberts, the brother who was associated in business with the testator in Washington, was desirous of making some arrangement which would substantially effectuate his brother's intention. To that end, on September 28, 1948, after consultation with an attorney in Washington, he conveyed for a nominal consideration of $10.00, his interest in the property to respondent with the expectation, although not incorporated in the deed, that she would devise said property to appellant provided he complied with the terms of his contract. On September 30, 1948, Enos R. Roberts, father of appellant, made a similar conveyance of his interest.

The relations between respondent and appellant's family were harmonious and the arrangement seemed to work out satisfactorily for approximately two years. There were a few instances of minor disagreements during this period but they were quickly ironed out and resulted in no ill feeling. Serious friction, however, arose in April, 1949. Appellant wanted to buy a piano so that his three children, ranging in age from two to ten years, could take music lessons. Respondent seriously objected to this on account of her age and nervous condition. Appellant and his wife insisted that they were going to purchase the piano notwithstanding respondent's objection. Although the piano was never purchased, the breach between the parties progressively widened until, as shown by various incidents hereinafter mentioned, the feeling has now become so bitter that the home has ceased to be a place where respondent can live in peace and happiness.

As a result of the foregoing situation, respondent, on August 16, 1949, brought an action in the magistrate's court to eject appellant from the premises. Appellant raised the question of title, whereupon the proceedings in the magistrate's court were discontinued and the instant action commenced on October 4, 1949.

Respondent alleged in her complaint that she had fee simple title to the property in controversy and was entitled to exclusive possession thereof; and that appellant, after notice, has refused to vacate the premises, claiming some equitable estate or interest therein adverse to her. She asked for an adjudication that appellant has no right, title or interest in the premises. She further requested that he be removed therefrom and exclusive possession be given to her. In his answer, appellant denied that respondent had fee simple title to the premises, claimed that he was the fee simple owner, and asserted that he and his family were lawfully occupying a portion of the house under the terms of the contract heretofore mentioned. He alleged that the conditions of said contract had been faithfully performed by him, but that re-

spondent had "never performed her part of the contract in that she has never paid her share of the expenses for the maintenance of the home." He asked that the Court confirm his right to reside in the home and that he be declared to be the owner in fee simple of said premises.

By consent of the parties, the action was referred to the Probate Judge for Marion County for the sole purpose of taking the testimony. The case was thereafter heard by the Resident Judge of the Twelfth Circuit, without a jury, on the pleadings and testimony transmitted by the Probate Judge. The Court, in an order filed on November 22, 1950, held that respondent had fee simple title to said property and was entitled to the immediate and exclusive possession thereof, and directed appellant to vacate the premises. In reaching this conclusion, the Court below found that appellant had failed to carry out the obligations assumed by him which had the effect of defeating "any right to either present or future possession of .or title to the property." It was further held that even if appellant had discharged these obligations, his claim to the property was prematurely asserted.

The allegation in appellant's answer that respondent has failed to perform her part of the contract in that she has not paid her share of the expenses for the maintenance of the home is completely refuted by the testimony which abundantly shows, as found by the Circuit Judge, that respondent has fully borne her share of these expenses and, in addition, made one very substantial gift of money to appellant. We do not understand that this conclusion is seriously challenged on this appeal. Indeed, there is no sound basis for any claim on the part of either party that the other has failed to do his or her part with respect to the material contributions to the maintenance of this home. The discord seems not to arise from this source but rather from things of a more intangible nature. We think the deplorable situation now existing has primarily resulted from the unjustified attitude of appellant and the ill treatment to which respondent has been subjected.

There is no social intercourse between the parties in this home. Except at meal time, the members of appellant's family keep to themselves. They do not speak to respondent unless she asks a question. Appellant said that he went about his business and respondent went about hers and "we don't meddle with each other." He and his wife, and their children under their instructions, address respondent as "Mrs. Flowers". On one occasion when she gave the children some money for Christmas, they were required to return it. No member of appellant's family accompanies respondent when she goes to church or uptown on various errands. Prior to the piano episode, respondent assisted at times in the kitchen but she is now forbidden to do so. She has been given to understand that anything she does around the house is not appreciated. Appellant, during one of the discussions over the piano, remarked: "Well, I am sorry I ever came to live with you. I don't like living here." His wife testified as follows in relation to the differences between the parties: "Q. Well, those differences seem to be irreconcilable, don't they? A. I guess so." As indicative of the present attitude of appellant toward respondent, when asked during the trial if his aunt ate like a healthy woman, he replied, "Well, I would hate to see one that wasn't healthy eat like she does."

It should be stated that the conduct of respondent has not been entirely faultless. The testimony shows a few instances in which she perhaps could have been a little more considerate of appellant and his family, but she has clearly done nothing which could be reasonably said to justify their conduct.

We shall first determine whether appellant has any legal estate in the property in controversy. He contends that upon the death of Frank Monroe Roberts, he took a fee simple title, subject to the obligations imposed by the contract in question, which are claimed to be conditions subsequent. There is no basis for this claim of title. Appellant acquired no legal estate whatsoever upon the death of his uncle and has none now. Fee simple title to the prop-

erty is in respondent. Of course, she holds it subject to the right, if any, on the part of appellant to specific performance. It is, therefore, needless to inquire into the nature of the estate which appellant would have taken had the property been devised to him in conformity with the contract.

It follows that respondent as the holder of the legal title is entitled to exclusive possession of the property unless appellant has shown the right to specific performance of the contract made with his uncle.

The rule is well settled "that specific performance is not a matter of absolute right, but rests in the sound discretion of the Court, guided by established principles, and is exercised by a consideration of all the circumstances of each particular case." *Masonic Temple, Inc., v. Ebert*, 199 S. C. 5, 18 S. E. (2d) 584, 590. The statement is made in appellant's brief that this discretionary power does not exist when the contract is in writing. We know of no authority for that view. The principle just stated has been applied in actions to enforce specific performance of contracts to devise real estate in consideration of the rendition of personal services. The Court had under consideration such a contract in *Samuel v. Young*, 214 S. C. 91, 51 S. E. (2d) 367, 370, where it was stated: "It is a well established rule that a party cannot demand the specific performance of a contract of this kind as a matter of right, but that the exercise of this power rests in the sound discretion of the court, in view of all the surrounding circumstances." Among the matters which may be considered by the court in determining the right to specific performance is the well known maxim of equity that "he who seeks equity must do equity". In *Masonic Temple, Inc., v. Ebert, supra,* the Court said: "For many years it has been held that the Court of Equity will refuse to lend its aid to one who has been guilty of inequitable conduct in the subject matter. We think that this maxim aptly fits the present case. The equitable status of the plaintiffs is the primary consideration."

Respondent contends, and the Court below held (1) that the obligations assumed by appellant under the contract are conditions precedent and since the services mentioned must be rendered as long as respondent lives, appellant would not now be entitled to specific performance even if there had been no breach of the contract; and (2) that the conduct of appellant was such as to constitute a substantial breach of the contract which forfeited all of his rights thereunder and permanently barred any action for specific performance. On the other hand, appellant takes the position that the right to specific performance must be determined as of the date of the testator's death and that he need only show performance up to that time. It is argued that since the disagreement between the parties arose subsequent to the death of the testator, appellant is entitled to judgment enforcing specific performance of the contract which would relate back to the time of the death of Frank Monroe Roberts, and that the estate thus vested in him would continue until it was affimatively shown that there had been a breach of the obligations, which appellant claims are conditions subsequent.

We do not find it necessary to pass upon all of the questions raised by the foregoing contentions. The issue here is not whether the right to specific performance existed upon the death of the testator without making the agreed testamentary provision, but whether appellant is entitled to specific performance under the facts and circumstances existing at the time of the commencement of this action.

Implicit in the contract involved in this controversy is the obligation on the part of appellant to be considerate of respondent and courteous in his relations with her. He was to "take care of" and "make a good comfortable home for her and see to her needs". Financial aid was not included, for it was expressly stated that "she will be self-supporting at all times." He was to give that care and attention required by old age. This home was not to be a mere shelter for respondent or a place of abode. See *Whor-*

*ton v. Snell,* 226 Ala. 525, 147 So. 602. It is stated in 57 Am. Jur., Wills, Section 172: "An undertaking 'to take care of' aged persons, in consideration of a promise to devise property, has been held to contemplate great patience with their infirmities, and to include * * * good temper, forbearance, and an honest effort to please."

The conduct of appellant, for which there seems to be no feeling of regret or penitence, has certainly not been in keeping with the foregoing obligations. The deplorable condition now existing in this home, due largely to the fault of appellant and his wife, if allowed to continue, would clearly defeat the primary object sought to be accomplished by the contract. It is true that the discord arose subsequent to the death of Frank Monroe Roberts, but assuming that the conditions of the contract should be regarded as conditions subsequent, which is doubtful, and assuming further that in an action for specific performance appellant need only show performance up to the time of the death of Frank Monroe Roberts, which is likewise doubtful, appellant's conduct subsequent to the death of his uncle and his present attitude may properly be considered by the Court in determining in its discretion whether specific performance should be allowed. Under the existing circumstances, we think that in the exercise of our discretion, such relief at this time should be denied.

The Court below went further and held that appellant had forfeited all of his rights under the contract and should be permanently barred of any future relief, but we think the decision should be more limited. We only hold now that there is no present right to specific performance and that respondent, as the holder of the legal title, is entitled to exclusive possession of the premises, which should be forthwith vacated by appellant. We do not undertake to adjudge that appellant's conduct is of such gravity that all of his right should be forfeited. His right to future relief, and if so. the character of such relief, will depend upon various circumstances, including his attitude and demeanor here-

after. The Court desires to add its sincere hope that it will yet be possible for the parties to resume their former pleasant relations.

There are two other minor questions raised by the exceptions but neither is substantial enough to affect the conclusions reached.

The decree appealed from is modified in accordance with the views herein expressed.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.