# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Michael D. Royal, Appellant,

v.

Free Kindergarten Association of Charleston, Respondent,

The Attorney General of the State of South Carolina and Charleston County School District, Respondents.

Appellate Case No. 2022-001165

_____

Appeal From Charleston County
Mikell R. Scarborough, Master-in-Equity

_____

Opinion No. 6102
Heard September 11, 2024 – Filed February 19, 2025

_____

**AFFIRMED**

_____

Jeffrey Scott Tibbals, Sr., and Evan Patrick Williams, both of Bybee & Tibbals, LLC, of Mount Pleasant, for Appellant.

Joseph Kevin Qualey, of Qualey Law Firm, and Patrick F. Stringer, of Stringer & Stringer, both of Charleston, for Free Kindergarten Association of Charleston.

Warren W. Ariail, of Ariail Law Firm, LLC, and A. Bright Ariail, of Law Office of A. Bright Ariail, LLC, both of Charleston, for Charleston County School District.

Assistant Attorney General Kristin M. Simons and
Assistant Attorney General Mary Frances G. Jowers,
both of Columbia, for The Attorney General of the State
of South Carolina.

---

**TURNER, J.:**  In this action for breach of contract and specific performance of a real estate purchase agreement (the Agreement) between Michael D. Royal and Free Kindergarten Association of Charleston (FKAC), Royal appeals the order of the master-in-equity granting the Attorney General's (AG's) motion for nonsuit. Royal argues the master erred by (1) finding FKAC was governed by the 1994 Nonprofit Corporation Act; (2) finding June Murray Wells did not have authority to execute the Agreement on behalf of FKAC; (3) finding the Agreement violated public policy; (4) refusing to grant specific performance of the Agreement and granting the AG's motion for nonsuit; (5) finding the AG had "veto power" over the Agreement and allowing the AG to intervene in the action; (6) allowing the Charleston County School District (CCSD) to intervene and file affirmative claims in the action; and (7) excluding the transcript of CCSD's Rule 30(b)(6) deposition. We affirm.

## FACTS AND PROCEDURAL HISTORY

FKAC was chartered as a nonprofit corporation in 1901 with a mission to "maintain a Training School for Kindergarteners, one or more Free Kindergartens in the city of Charleston."[1]  FKAC operated a kindergarten on property it owns at 34 Pitt Street in downtown Charleston.  Per its constitution, FKAC's members attended monthly meetings, elected FKAC's seven officers, and could vote to amend the constitution and bylaws.  The President and other officers then appointed members to the Executive Committee, which was charged with "transact[ing] the necessary business" of FKAC.  The constitution also provided for an Educational Committee, chaired by the director of the kindergarten, whose purpose was "to aid the Director in any questions pertaining to the educational interests of the Training School."  June Murray Wells served as Director of the kindergarten from 1990 until it ceased operations in the early 2000s.  In an unrelated 2010 probate action, Wells asserted via affidavit that she was the last surviving member of FKAC, and she did not object to the termination of FKAC's

---

[1] FKAC was originally known as the South Carolina Kindergarten Association.  It amended its charter to change its name to FKAC in 1931.

only funding source. Thus, the Pitt Street property sat essentially unused for several years.

In December 2011, Royal discovered the Pitt Street property and began searching for the owner in hopes of purchasing it. Royal eventually determined the property was owned by FKAC, and he contacted Wells to set up a meeting. According to Royal, Wells represented that FKAC was willing to sell the property and that she was the proper person to talk to about a potential sale. Royal hired Michael Robinson to appraise the property, and Robinson estimated the fair market value of the property to be $315,200 as of December 19, 2012. On April 23, 2013, Royal and Wells entered into the Agreement, which Royal drafted, for the sale of the property at a purchase price of $315,200. Wells signed the Agreement on behalf of FKAC, with her signature line stating she was FKAC's "authorized agent."[2] However, the parties later executed two addenda to the Agreement, which Wells signed as FKAC's "sole surviving member."[3]

The Agreement contained several unusual terms. First, it gave FKAC the option to set the closing date any time within five years, on or before April 9, 2018.[4] Additionally, the Agreement repeatedly acknowledged the uncertainty around Wells' authority to enter into the contract on FKAC's behalf. Paragraph 2 stated Royal's down payment would be returned to him if FKAC was "unable to show authority for [Wells] to act on its behalf." Paragraph 6 stated that if FKAC was "unable to provide documentation of [Wells's] authority to dispose of the [p]roperty on behalf of [FKAC]," Royal and Wells would "petition the Court of Common Pleas of Charleston County to establish her authority" at Royal's expense.

Over the course of the next five years, Royal sought to close on the property. In March 2018, FKAC retained an attorney, and on April 4, 2018, it notified the AG of the pending sale and its intention to dissolve for the first time.[5] Several days later, FKAC forwarded the 2013 appraisal to the AG; however, the AG requested an updated appraisal in order to complete its review of the sale. On May 11, 2018,

---

[2] Neither Wells nor FKAC was represented by counsel at the time Wells signed the Agreement.

[3] Wells died on November 29, 2020.

[4] The purpose of the addenda were to extend the closing date—first to April 26, 2018, and then to May 25, 2018.

[5] *See* S.C. Code Ann. § 33-31-1202(f) (2006) (explaining that a public benefit corporation must notify the AG twenty days before it sells or disposes of all or substantially all of its property or assets).

FKAC sent Royal a letter stating it would not agree to close "without approval of the [AG]." In the letter, FKAC asserted it believed "there [was] a real issue as to the authority of the sole surviving member of [FKAC] to sell" the property and noted "the distribution of the proceeds" also needed to be adjudicated.[6]

Shortly thereafter, on May 18, 2018, the AG notified Royal and FKAC of its position that the sale could not "go forward" until it had completed its review of the transaction, including having an updated appraisal conducted. The AG requested to be named as a party in any action filed and stated it would work with Royal and FKAC to resolve any outstanding issues, particularly the need "to confirm [Wells's] authority to sell the property." The AG then obtained an updated appraisal dated June 7, 2018, stating the fair market value of the property was $522,500. On June 28, 2018, FKAC notified Royal that the AG would not approve the sale, and therefore, FKAC was "unwilling to proceed to closing."

Royal filed a summons and complaint for breach of contract and specific performance. FKAC answered and asserted several defenses; it also requested the court "make a determination as to whether the sole surviving member of [FKAC] is June Murray Wells and is therefore authorized to sell" the property.[7] It also asked the court to determine whether the sale should be approved and whether the proceeds should be paid "to Charleston County School District Number 20." The AG moved to intervene, citing its "*parens patriae* authority in accordance with the common law as well as [its] statutory authority to protect the public interest . . . in matters involving . . . the sale of assets of a nonprofit corporation outside the ordinary course of business." CCSD also moved to intervene, arguing it had a "significantly protectable interest in the real property and real estate transaction," as the successor to Charleston County School District No. 20's interest. Both motions were granted.

At trial, Royal and Robinson, the appraiser, testified. At the end of Royal's testimony, the master granted the AG's motion for nonsuit. In the order, the master found that "Wells had some authority but not absolute authority to act" on FKAC's behalf, and "the extent of Wells['s] limited authority [did] not constitute actual, implied or apparent authority to enter into the Agreement on behalf of [FKAC]."

---

[6] In 1971, FKAC passed a resolution that stated that in the event of its dissolution, "the residual assets of [FKAC] will be turned over to Charleston School District #20."

[7] We note FKAC's position on whether Wells had authority to act as its agent has been inconsistent throughout this litigation.

The order also detailed other bases for invalidating the Agreement. Royal filed a Rule 59(e), SCRCP, motion to reconsider, which was denied. This appeal followed.

**STANDARD OF REVIEW**

"An action for specific performance is one in equity." *Campbell v. Carr*, 361 S.C. 258, 262, 603 S.E.2d 625, 627 (Ct. App. 2004). "In equity actions[,] an appellate court can review the record and make findings based on its view of the preponderance of the evidence." *Ingram v. Kasey's Assocs.*, 340 S.C. 98, 105, 531 S.E.2d 287, 290-91 (2000). "However, this [c]ourt is not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility." *Id.* at 105, 531 S.E.2d at 291.

**LAW/ANALYSIS**

The central issue before this court is whether the master-in-equity erred in denying Royal's request for specific performance and granting the AG's motion for nonsuit.[8] Royal contends the master erred because Wells had explicit or apparent authority to enter into the Agreement on FKAC's behalf. He also contends FKAC was not governed by the 1994 Nonprofit Corporation Act (the 1994 Act) and the master incorrectly applied those statutes to the issues in this case.

### I. Applicability of the 1994 Act

The 1994 Act states it applies to all nonprofit corporations extant as of the 1994 Act's effective date that were previously governed by the 1976 Act. S.C. Code Ann. § 33-31-1701(a) (2006). The 1900 Act, under which FKAC was incorporated, is listed in the 1976 Act's legislative history, as are various amendments from 1902 through 1962. *See* S.C. Code Ann. § 33-31-10 (1976). Thus, we hold FKAC was governed by the 1976 Act (and its predecessors), and the 1994 Act explicitly applies to it. *See* § 33-31-1701(a) ("This chapter applies to all domestic corporations which on this chapter's effective date were governed by Title 33, Chapter 31 of the 1976 Code.").

### II. Authority of June Wells to Bind FKAC

"The fundamental basis of a suit for specific performance is that there is a contract between the parties[.]" *Finklea v. Carolina Farms Co.*, 196 S.C. 466, 471, 13

---

[8] Although Royal pled two causes of action, it is clear that the main purpose of the lawsuit was Royal's request for specific performance of the Agreement.

S.E.2d 596, 599 (1941). "A court may order specific performance if: (1) a valid contract exists between the parties; (2) no adequate remedy at law exists for the breach; (3) specific performance is equitable between the parties; and (4) no fraud, accident, or mistake infects the contract." *Time Warner Cable v. Condo Servs., Inc.*, 381 S.C. 275, 281, 672 S.E.2d 816, 819 (Ct. App. 2009). "Specific performance of a contract of a corporation may be decreed in a proper case, but not where the contract . . . was entered into on behalf of the corporation by a particular officer without proper authorization, ratification, or approval." *Masonic Temple v. Ebert*, 199 S.C. 5, 18 S.E.2d 584, 587-88 (1942) (quoting *Finklea*, 196 S.C. at 472-73, 13 S.E.2d at 599).

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." *Froneberger v. Smith*, 406 S.C. 37, 49, 748 S.E.2d 625, 631 (Ct. App. 2013). "Two things are necessary to enable an agent to bind his principal: first, he must have authority for that purpose; second, he must duly exercise it." *Sampson & Wyatt v. Singer Mfg. Co.*, 5 S.C. 465, 467 (1875). "A party asserting agency as a basis of liability must prove the existence of the agency . . . ." *McCall v. Finley*, 294 S.C. 1, 6, 362 S.E.2d 26, 29 (Ct. App. 1987). Additionally, "it is the duty of one dealing with an agent to use due care to ascertain the scope of the agent's authority." *Id.* at 6, 362 S.E.2d at 29 (quoting *Justus v. Universal Credit Co.*, 189 S.C. 487, 495, 1 S.E.2d 508, 511 (1939)).

## A. Express Authority

Royal argues Wells had express authority to act as FKAC's agent because (1) she was the last surviving member of a member-controlled entity and therefore had 100% voting power and (2) Wells's various other roles within FKAC made her its only agent because FKAC is not controlled by the 1994 Act. We disagree.

"The authority of an officer of a corporation is not inherent in his title or position." *Pee Dee Nursing Home, Inc. v. Florence Gen. Hosp.*, 309 S.C. 80, 84, 419 S.E.2d 834, 837 (Ct. App. 1992) (quoting *Orphan Aid Soc. v. Jenkins*, 294 S.C. 106, 110, 362 S.E.2d 885, 887 (Ct. App. 1987)). Rather, "agency is a question of fact" and "may be established by evidence of actual or apparent authority." *R & G Const., Inc. v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 432, 434, 540 S.E.2d 113, 117-18 (Ct. App. 2000). "[A]ctual authority is expressly conferred upon the agent by the principal." *Richardson v. P.V., Inc.*, 383 S.C. 610, 615, 682 S.E.2d 263, 265 (2009).

The only voting rights specifically granted to members by FKAC's constitution and bylaws are the right to vote to (1) elect officers, (2) amend the constitution, and (3) amend the bylaws. The various officers then in turn appoint members to serve on the Executive Committee, with the President of FKAC serving as the committee's Chairman. It is the duty of the Executive Committee "to transact the necessary business of [FKAC]." Therefore, we find the authority to transact business on behalf of FKAC lies only with the Executive Committee, not FKAC's members.

Further, the 1994 Act sets forth specific parameters for how a nonprofit corporation must conduct its business, particularly when it comes to the sale of assets. *See* S.C. Code Ann. §§ 33-31-801 to -858, -1202 (2006). Section 33-31-801(a) states that every nonprofit corporation "must have a board of directors." The 1994 Act defines "board" or "board of directors" as "the individual or individuals vested with overall management of the affairs" of the corporation, "irrespective of the name by which the individual or individuals are designated." S.C. Code Ann § 33-31-140(3) (2006). Further, the 1994 Act states that "all corporate powers must be exercised by or under the authority of and the affairs of the corporation managed under the direction of its board," unless specifically delegated to other persons by the corporation's bylaws. §§ 33-31-801(b)-(c). Because FKAC's Executive Committee is tasked with "transact[ing] the necessary business" of FKAC, the Executive Committee was FKAC's equivalent of a board of directors.

The 1994 Act provides that when a nonprofit corporation wishes to "sell . . . or otherwise dispose of all, or substantially all, of its property . . . other than in the usual and regular course of its activities on the terms and conditions and for the consideration *determined by the corporation's board*," if a corporation's members are not entitled to vote on the sale of assets, "the transaction must be approved by a vote of a majority of the directors in office at the time the transaction is approved," after providing notice of a directors' meeting for the purpose of voting on the sale.[9] § 33-31-1202(a)-(c) (emphasis added). Based on FKAC's constitution and bylaws alone, the sale would have required approval by at least a quorum of the Executive Committee, although we note it is not clear that the Executive Committee's mandate to "transact the necessary business" of FKAC included selling all or substantially all of its assets outside of the normal course of its business.

---

[9] "Directors" as used in this context equates to board members. *See* § 33-31-140(10) (2006) (defining "directors" as "persons, designated in the charter or bylaws . . . , and persons elected or appointed to act as members of the board, irrespective of . . . names or titles").

Furthermore, the record is devoid of evidence that a meeting was called or any official vote was held regarding the sale.

The record contains evidence that Wells was the long-time director of the kindergarten, but there is no evidence she was an Executive Committee member at the time she signed the Agreement. There is some evidence Wells was a board member of *some* kind in the past, but not that she was an Executive Committee member, specifically. We note Wells's position as director of the kindergarten would have made her a member of the *Educational* Committee, not the Executive Committee.

In *Pee Dee Nursing Home, Inc. v. Florence General Hospital*, the nursing home sought specific performance of an agreement entered into with the hospital's president regarding the transfer of nursing home beds. 309 S.C. at 81, 419 S.E.2d at 835. Although the hospital's bylaws stated the hospital's president would be "given the necessary authority and responsibility to operate the hospital in all its activities and departments," the trial judge nonetheless found, and this court affirmed, that the hospital president did not have authority to enter into the agreement because the bylaws vested the power to control and manage "the [hospital's] property, affairs and funds" in a "governing board." *Id.* at 82, 419 S.E.2d at 436. This court found there was "no evidence that the board delegated authority to [the hospital president] to dispose of hospital assets," and therefore, the hospital president did not have actual authority to enter into the agreement. *Id.* at 83, 419 S.E.2d at 836. Similarly, we find Wells did not have authority to act as FKAC's agent in disposing of its assets, notwithstanding any authority she may have had to operate the kindergarten. *See Bank of Hamburg v. Johnson*, 37 S.C.L. (3 Rich.) 42, 46 (1846) ("It is required, in order to charge one with a contract, alleged to have been made by an agent, clearly to prove the agent's authority, and . . . to supply proof of the specific powers which were incident to [the] agency, and *to sh[o]w that the contracts . . . were within the scope of [the] authority*." (emphasis added)). Neither FKAC's governing documents nor the 1994 Act grant such authority to single members, an advisory board like the Educational Committee, or the director of the kindergarten. *See* §§ 33-31-801, -1202. Further, the record is devoid of any evidence that FKAC's Executive Committee expressly granted such authority to Wells. *See Richardson*, 383 S.C. at 615, 682 S.E.2d at 265 ("[A]ctual authority is expressly conferred upon the agent by the principal . . . ."). Therefore, we hold Wells did not have express authority to enter into the Agreement on FKAC's behalf.

**B. Apparent Authority and Agency by Estoppel**

Royal argues Wells had apparent authority to act as FKAC's agent and points to a multitude of documents purporting to evince that authority, such as tax notices; bank records; correspondence with various entities in Wells' name under her various titles at FKAC; and the affidavit in the 2010 probate case, prepared by the AG, in which Wells stated she was the "last living advisory member of [FKAC] with capacity of act" on FKAC's behalf. Royal contends the AG's decision to forego dissolution proceedings in 2010 placed Wells in a position of authority. He further asserts that the AG and CCSD have attempted to "step into FKAC's shoes" as principals to deny Wells's agency, and they should be estopped from doing so because they have accepted Wells's authority in the past. We disagree.

Under the doctrine of apparent authority,

> the principal is bound by the acts of its agent when it has placed the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe the agent has certain authority and they in turn deal with the agent based on that assumption.

*Chambers of South Carolina, Inc. v. Entrepreneur, Inc.*, 292 S.C. 97, 100, 354 S.E.2d 921, 923 (Ct. App. 1987) (quoting *Fernander v. Thigpen*, 278 S.C. 140, 143, 293 S.E.2d 424, 426 (1982)). "The elements of apparent agency are: (1) [the] purported principal consciously or impliedly represented another to be his agent; (2) [the] third party reasonably relied on the representation; and (3) [the] third party detrimentally changed his or her position in reliance on the representation." *R & G Const.*, 343 S.C. at 433, 540 S.E.2d at 118. "The first element of apparent agency can be established by either: (1) affirmative conduct or (2) conscious and voluntary inaction." *Froneberger*, 406 S.C. at 47, 748 S.E.2d at 630. Essentially, "the principal must intend to cause the third person to believe the agent is authorized to act for him, or he should realize his conduct is likely to create such belief." *R & G Const.*, 343 S.C. at 433, 540 S.E.2d at 118. Thus, "[t]he proper focus in determining a claim of apparent authority is not on the relationship between the principal and the agent, but on that between the principal and the third party." *Id.* at 432-33, 540 S.E.2d at 118. "An agency may not be established solely by the declarations and conduct of an alleged agent." *Id.* at 433, 540 S.E.2d at 118.

As to the first element, there is no "evidence of any manifestations by the *board* that the [purported agent] had the authority to enter the contract." *Pee Dee Nursing Home*, 309 S.C. at 84, 419 S.E.2d at 837 (emphasis added). As discussed above, Wells's title of director, alone, "is insufficient to show apparent authority." *Id.*

"This is especially true in light of the unusual nature of the transaction involved; one not associated with the ordinary and day to day administration" of FKAC. *Id.* Additionally, we find FKAC did not create apparent authority in Wells by "conscious and voluntary inaction" because FKAC, as a distinct entity from Wells, was unaware of her actions. *Froneburger*, 406 S.C. at 47-49, 748 S.E.2d at 630-31 (explaining that "[w]ithout knowledge of [the purported agent's] conduct, [the purported principal] cannot have permitted this behavior with conscious inaction").

Similarly, Royal's argument for establishing apparent authority rests on representations made by Wells—the purported agent—rather than by FKAC. Importantly, none of the documents he relies upon, including the probate affidavit, originate from FKAC alone without involvement from Wells, and most are records from third parties, such as a bank and various state agencies. Royal places particular emphasis on the affidavit in which Wells represented that she was FKAC's last living "advisory member" and the only person "with capacity to act" on FKAC's behalf. Although the AG prepared the affidavit, it appears it did so based on representations from Wells, as the letter accompanying the affidavit for signature was addressed to Wells personally, not to FKAC or counsel for FKAC. This evidence of purported authority is unavailing because "[a]n agency may not be established solely by the declarations and conduct of an alleged agent." *R & G Const.*, 343 S.C. at 433, 540 S.E.2d at 118.

As to Royal's argument that the AG and CCSD are estopped from denying Wells's authority because they have accepted it in the past, Royal misunderstands agency by estoppel. "[T]here is no true difference between apparent authority and agency by estoppel." *Eadie v. H.A. Sack Co.*, 322 S.C. 164, 171, 470 S.E.2d 397, 401 (quoting 3 Am. Jur. 2d *Agency* § 81 (1986)). "When a *principal*, by any such acts or conduct, has knowingly caused or permitted another to appear to be his agent, either generally or for a particular purpose, he will be estopped to deny such agency to the injury of third persons." *R & G Const.*, 343 S.C. at 433, 540 S.E.2d at 118 (emphasis added). Here, neither the AG nor CCSD are the principal, and there was no other person to act on behalf of FKAC, as a distinct entity from Wells. Additionally, it was Royal's obligation "to use due care to ascertain the scope of the agent's authority" in any particular transaction, and he is not entitled to rely on representations made during prior dealings. *Pee Dee*, 309 S.C. at 85, 419 S.E.2d at 837. Thus, even if the AG accepted Wells's authority in the probate case to forego continued funding for FKAC's kindergarten, it was not required to accept that Wells had authority to enter into the sale of all or substantially all of the corporation's assets. *See id.* (explaining that to accept this argument regarding prior dealings "would automatically create apparent authority in [an] agent to enter

into contracts which would otherwise require the principal's approval by the mere fact that the agent dealt with the third party on a similar matter in the past"). Finally, CCSD was unaware of its potential interest in the property until FKAC notified it via letter dated June 1, 2018. There is no evidence in the record that CCSD had prior dealings with Wells or previously accepted her as an agent of FKAC.

Accordingly, we hold Wells did not have apparent authority to enter into the Agreement on FKAC's behalf, and the AG and CCSD are not estopped from denying Wells's authority.

### III. Specific Performance

Because Wells did not have authority to enter into the Agreement on FKAC's behalf, we find there was no valid contract to enforce. *See Time Warner Cable*, 381 S.C. at 281, 672 S.E.2d at 819 (stating that the first element of specific performance is that "a valid contract exists between the parties"); *Finklea*, 196 S.C. at 471-72, 13 S.E.2d at 599 ("Before specific performance can be decreed, it is first necessary to determine whether there is a contract between the parties or not." (quoting *Yawkey v. Lowndes*, 150 S.C. 493, 513, 148 S.E. 554, 560 (1929))). Therefore, we hold Royal was not entitled to specific performance and the master properly granted the AG's motion for nonsuit. *See Yawkey*, 150 S.C. at 513, 148 S.E. at 560 ("If there is no contract, then there is nothing to enforce."); *Johnson v. J.P. Stevens & Co.*, 308 S.C. 116, 118, 417 S.E.2d 527, 529 (1992) ("Rule 41(b) allows the judge as the trier of facts to weigh the evidence, determine the facts and render a judgment against the plaintiff at the close of his case if justified.").

### IV. CCSD as Beneficiary

The master also ordered the receiver to sell the Pitt Street property and dissolve FKAC, with any remaining proceeds or assets to be directed to CCSD. We question if the issue of whether CCSD is the proper party to receive the remaining assets is preserved for our review because Royal raised it only in the context of arguing that CCSD should not have been allowed to intervene. However, out of an abundance of caution, because the master ordered FKAC's dissolution and the parties did not appeal that ruling, we address the issue of where to direct FKAC's remaining assets upon its dissolution. *See Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 333, 730 S.E.2d 282, 287 (2012) ("[W]here the question of [issue] preservation is subject to multiple interpretations, any doubt should be resolved in favor of preservation." (Toal, C.J., concurring)). We agree with the master that CCSD is the proper beneficiary.

In 1971, FKAC amended its charter to specify that upon its dissolution, its "residual assets" should be "turned over to Charleston School District #20, part of the South Carolina State School system[,] for general use." CCSD was created in 1967, when the General Assembly consolidated the various independent Charleston County school districts. *See Smythe v. Stroman*, 251 S.C. 277, 289, 162 S.E.2d 168, 174 (1968) (upholding the constitutionality of the consolidation). Although Charleston County School District #20 still exists as an administrative entity with limited powers within CCSD, the consolidation vested CCSD with all of the "property, rights, and obligations" of the consolidated districts. *See* 1967 S.C. Acts 340; S.C. Code Ann. § 59-17-70 (2020) ("Upon consolidation of any two or more school districts, all property, real and personal, and all assets of the districts forming the consolidated school district shall become the property of the consolidated district . . . ."); *Smythe*, 251 S.C. at 285, 162 S.E.2d at 171 (explaining that "[t]he general law supports the proposition that upon a consolidation of school districts . . . the consolidated district succeeds to all of the assets of the former districts"). Therefore, we hold CCSD is the proper beneficiary of any remaining assets of FKAC upon FKAC's dissolution, including any proceeds from of the sale of the Pitt Street property.

**CONCLUSION**

Because the issue of specific performance is dispositive, we decline to reach the remaining issues. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling an appellate court need not address remaining issues when its resolution of a prior issue is dispositive). The master's order is

**AFFIRMED**.

**WILLIAMS, C.J., and MCDONALD, J., concur.**