CONAGRA, INC., APPELLEE AND CROSS-APPELLANT, V. CARGILL, INCORPORATED, CARGILL HOLDINGS, INCORPORATED, AND MBPXL CORPORATION, APPELLANTS AND CROSS-APPELLEES.

382 N.W.2d 576

Filed March 7, 1986.   No. 83-849.

· Fredric H. Kauffman and David R. Buntain of Cline, Williams, Wright, Johnson & Oldfather, for appellants.

John E. North and Leo A. Knowles of McGrath, North, O'Malley & Kratz, P.C., for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, SHANAHAN, and GRANT, JJ., and RIST, D.J., and COLWELL, D.J., Retired.

PER CURIAM.

This appeal from the district court for Douglas County arises out of a corporate takeover battle between the plaintiff, ConAgra, Inc., and the defendant Cargill, Incorporated, to acquire a "target company," MBPXL Corporation. The following facts surrounding this litigation are uncontroverted by the parties. Further facts will be discussed in greater detail as they are applicable to individual assignments of error.

The plaintiff, ConAgra, is a publicly owned corporation with its stock listed on the New York Stock Exchange. Cargill and its wholly owned subsidiary, Cargill Holdings, Incorporated, are privately held corporations. Prior to its acquisition, the target company, MBPXL, was also a publicly held corporation with its stock traded on the New York Stock Exchange. All three corporate parties are corporations organized under the laws of the State of Delaware.

In July 1978 ConAgra and MBPXL management representatives met to discuss a potential stock merger between the two companies. On August 11, 1978, management representatives of MBPXL and ConAgra signed a "letter of intent" proposing a merger of the two companies. On August 16, 1978, the board of directors of MBPXL rejected this letter of intent. A second letter of intent, approved by the respective boards of ConAgra and MBPXL and setting forth the terms of the proposed merger, was executed by the presidents of MBPXL and ConAgra on September 28, 1978. From September 28 through October 17, 1978, representatives of ConAgra and MBPXL conducted negotiations of the proposed merger. In September 1978 representatives of Cargill met with MBPXL representatives to discuss a possible acquisition of the company by means of a cash purchase of MBPXL stock. On October 11 and 12, 1978, Cargill representatives toured MBPXL's major plant facilities. On October 16, 1978, ConAgra's board of directors, pursuant to its resolution, approved an "Agreement and Plan of Reorganization and Merger." On October 17, 1978, the board of directors of MBPXL approved the agreement, and a copy was duly executed by both parties.

On November 14 Cargill Holdings entered into 14 separate agreements with certain shareholders of MBPXL, who included Messrs. Howard N. Marcus and Jerome D. Marcus, officers and directors of MBPXL. Pursuant to these contracts, Cargill Holdings acquired outright 21.9 percent of MBPXL's outstanding shares of common stock and agreed to acquire another 4.5 percent on January 3, 1979. On November 16 and 27, and December 5, 1978, the board of directors of MBPXL met to discuss the ConAgra merger agreement, the proposed Cargill tender offer, and related matters. On December 7, 1978, Cargill Holdings commenced its tender offer in which it agreed to begin purchasing shares on December 27, 1978. By January 24, 1979, Cargill had acquired approximately 92.5 percent of the outstanding MBPXL common stock. Upon the merger's becoming effective the separate corporate existence of Cargill Holdings terminated. On March 1, 1979, Cargill Holdings was merged into MBPXL corporation and has since operated as a

wholly owned subsidiary of Cargill, Incorporated.

The record reveals that on November 21, 1978, ConAgra commenced an action in equity to restrain Cargill and Cargill Holdings from alleged tortious interference with the ConAgra-MBPXL merger agreement. On that same day the district court judge entered a temporary restraining order against the defendants. Following a full hearing on the matter, the district court entered a preliminary injunction enjoining the defendants "from tortiously interfering with the contractual relations between the Plaintiff and MBPXL Corporation." Nothing in the temporary injunction prevented the defendants from proceeding with a proposed tender offer for the stock of MBPXL; however, the district court enjoined the defendants from "selling, disposing of, encumbering or otherwise transferring said stock, until further order of this Court."

ConAgra later amended its petition, joining MBPXL as a party defendant and alleging that MBPXL was part of a conspiracy to interfere with the merger agreement and that MBPXL had breached that agreement. The defendants demurred to the amended petition on the grounds of improper joinder of contract and tort claims and parties defendant. The defendants' special demurrers were overruled.

Following extensive discovery, in November of 1979 the parties moved for partial summary judgment with respect to the issue of liability. After examining the pleadings, voluminous depositions, and exhibits, the district court, on April 10, 1980, concluded that no genuine issue of fact with respect to liability existed, entered a partial summary judgment in favor of the plaintiff, and denied the defendants' motion for partial summary judgment. The defendants subsequently moved the court to reconsider or make specific findings of fact, which motion was overruled. On September 30, 1981, the court determined that the case should proceed to trial as an equitable action, thereby denying the defendants' request to transfer the case to the law docket. Prior to trial, the case was transferred to a different district court judge, and the defendants renewed their motion to vacate the partial summary judgment or make specific findings of fact. These motions were again denied. Beginning on August 16, 1982, the district court held a 4-week

trial on the issues of proximate cause and damages. On October 3, 1983, the district court entered its decree and judgment against the defendants Cargill and MBPXL and awarded ConAgra $15,996,000 in damages. The defendants' subsequent motion for new trial was overruled on October 21, 1983.

The defendants appeal to this court and have assigned numerous errors relating to the pretrial rulings, partial summary judgment, and final decree rendered by the district court. For our purposes we need only discuss whether the district court was in error when it found that the respective corporations were liable to ConAgra because of MBPXL's failing to use its best efforts to bring about the proposed merger with ConAgra.

The "target" of two corporate bidders in this case was MBPXL, an integrated slaughterer and fabricator of beef products and byproducts. The corporation was formed in 1974 through the merger of Missouri Beef Packers, Inc., of Amarillo, Texas, and Kansas Beef Industries, Inc., of Wichita, Kansas. Since the merger of these two companies with their combined slaughter and fabrication facilities, MBPXL grew to be the second largest processor in the boxed beef industry, behind Iowa Beef Processors, the recognized leader in this highly competitive industry.

ConAgra is an Omaha-based, diversified, basic foods company with both domestic and international operations. As of its fiscal year ending May 29, 1977, ConAgra and its subsidiaries had total assets of $143,259,373, and stockholders' equity of $66,136,678. The consolidated net earnings of ConAgra for its fiscal year ending May 29, 1977, were $12,831,140.

Cargill is headquartered in Minneapolis, Minnesota, and is a privately held company engaged principally in the warehousing, transporting, merchandising, and processing of agricultural commodities. As of its fiscal year ending May 31, 1978, Cargill and its subsidiaries had total assets of approximately $3,252,315,000 and stockholders' equity of approximately $1,177,763,000. For the fiscal year ending May 31, 1978, the consolidated net income of Cargill was approximately $121,429,000.

ConAgra and Cargill are competitors. Approximately 90 percent of ConAgra's products are in competition with those of Cargill. In 1978, after careful study and evaluation, both ConAgra and Cargill concluded that MBPXL was the most attractive merger candidate for entrance into the boxed beef industry. In early 1978 ConAgra began contemplating entrance into the boxed beef industry and retained Lehman Brothers Kuhn Loeb, Incorporated, an investment banking firm, to discover potential merger candidates. However, it was not until July 1978 that officials from ConAgra initially met with representatives of MBPXL to discuss the possibility of a merger with ConAgra. Following this meeting, Messrs. Charles M. Harper and David La Fleur, the respective presidents of ConAgra and MBPXL, met again in Omaha.

On August 9, 1978, Messrs. Harper and La Fleur, along with Messrs. Melvin Rolf and Erving Priceman, the chairman and vice chairman of the board of MBPXL, held another meeting and agreed to meet in Kansas City within a few days with their lawyers and investment bankers to attempt to draw up an agreement in principle. On August 10, 1978, the executive committee of MBPXL's board of directors met and authorized Messrs. Rolf, La Fleur, and Priceman "to continue discussions with Con Agra" toward reaching such agreement. On August 11, 1978, an initial letter of intent was signed by Messrs. Harper and La Fleur, outlining the terms of agreement in principle. Under this initial agreement each shareholder of MBPXL was to receive, in exchange for one share of MBPXL common stock, seven-eighths of one share of ConAgra common stock plus one thirty-second of one share of ConAgra preferred stock. On August 14, 1978, the proposed merger was publicly announced by the parties.

On August 16, 1978, the board of directors of ConAgra met and approved the "Letter of Understanding" executed on August 11, 1978, between ConAgra and MBPXL. That same day, the board of directors of MBPXL also met and resolved "that MBPXL Corporation not pursue further negotiations with ConAgra, Inc. and to terminate any and all such merger negotiations immediately," and that the company would publicly announce the same.

Since November 1976, Cargill had been studying the U.S. beef processing industry. Cargill became particularly interested in MBPXL after the publicity that ensued following the breakdown in negotiations between ConAgra and MBPXL. On August 24, 1978, two internal memos were circulated among top Cargill executives, expressing an interest in acquiring MBPXL and recommending possible contact with the company through its lead bank, Chase Manhattan, to Mr. Samuel Marcus, a retired former officer and director of MBPXL.

However, in mid-August and early September 1978 negotiations began again between ConAgra and MBPXL. Pursuant to these revived negotiations, ConAgra increased its offer for MBPXL and proposed an exchange offer of MBPXL common stock one-for-one for ConAgra stock.

On September 14, 1978, the merger and acquisitions committee of MBPXL met and agreed to recommend to the corporation's executive committee that an investment banking firm be hired to determine the comparative value of the corporation were it to be sold in its entirety. Following this recommendation, the executive committee met the same day and resolved to retain the investment banking firm of Blyth Eastman Dillon & Co., Incorporated (hereafter referred to as BEDCO).

On September 21 representatives of BEDCO contacted Cargill and inquired whether it would be interested in MBPXL. In the notes of Mr. Benjamin S. Jaffray, vice president-finance and treasurer of Cargill, it appears that the September 21 conversation with BEDCO was in response to Cargill's inquiry of MBPXL's bank, Chase. During the conversation, it was conveyed to Mr. Jaffray that MBPXL was "not for sale" but that its president, Mr. La Fleur, considered it his responsibility to talk with anyone who might be interested in the company. Mr. Jaffray's notes also indicate that he was informed that the MBPXL board of directors would be meeting in a week, apparently to discuss the ConAgra proposal, and that if Cargill was truly interested, it would have to act quickly. Notes from the conversation also evince that certain MBPXL shareholders would be amenable to a "cash deal."

On September 25 BEDCO representatives again talked with

Mr. Jaffray and indicated that it would be better if Cargill officials met with MBPXL prior to September 28. Accordingly, on September 26, 1978, Cargill officials met in Wichita with Messrs. La Fleur and Rolf of MBPXL and Mr. Stanton of BEDCO. At that meeting Cargill officials expressed their interest in the boxed beef industry, and the parties generally discussed its strengths and weaknesses. During the meeting, the parties apparently discussed "what Cargill would do for MBPXL or could do for MBPXL," but Cargill officials "left that meeting with no real feeling about whether or not it would be appropriate or even possible for Cargill to proceed with any kind of attempted acquisition." Again, before the conclusion of the meeting, Mr. Stanton told Cargill officials that if they were interested, they should take action before September 28, the scheduled date of MBPXL's next board meeting.

On September 27 Messrs. Jaffray and Stanton had another phone conversation about the possible acquisition of MBPXL. Mr. Stanton indicated that Mr. La Fleur was favorably impressed with Cargill but that a $27- to $30-per-share cash tender offer "won't fly," versus a "$25 stock tax free transaction."

That same day, MBPXL officials met informally with their BEDCO advisers. Although not all the MBPXL directors were present, those present, including Messrs. Howard Marcus and Jerome Marcus, were informed of the meeting with Cargill and of that company's possible interest in MBPXL.

However, as stated earlier, on September 28, 1978, ConAgra and MBPXL entered into a second letter of intent, confirming "the general understanding reached concerning the possible combination" of ConAgra and MBPXL. The letter was executed jointly by Mr. Harper, ConAgra's chief executive officer, and Mr. La Fleur, president of MBPXL, and contemplated the further negotiations of a "Definitive Agreement and Plan of Reorganization and Merger." The second letter of intent was duly approved by both boards of directors. The signing of the second letter of intent was also well publicized.

Following the signing of the second letter of intent, however, Cargill's interest in MBPXL did not abate. On September 28

Mr. Nau from BEDCO telephoned Mr. Jaffray. Mr. Nau indicated at that time that Mr. Stanton had been unable to delay MBPXL board action and that if BEDCO were to do anything on Cargill's behalf, any offer by Cargill would have to be above $25 per share.

In late September or early October, Cargill retained both the investment banking firm of The First Boston Corporation and the New York law firm of Skadden, Arps, Slate, Meagher & Flom for financial and legal advice concerning the possible acquisition of MBPXL.

On October 5, 1978, Cargill's interest in MBPXL was formalized through a letter from Mr. Cargill MacMillan, Jr., Cargill's senior vice president, to Mr. La Fleur. The letter was evidently a followup to a phone conversation the two men had had earlier that day. During their phone conversation, Mr. La Fleur told Mr. MacMillan that, in his opinion, an offer of $27 per share would not "draw flies" and also that he felt that because MBPXL had signed a letter of intent with ConAgra, the company had an obligation to carry it out. Mr. MacMillan's letter stated that he and Cargill's president, Mr. M.D. McVay, were prepared to recommend to Cargill's board of directors that it approve the acquisition of MBPXL at $27 per share in cash if Mr. La Fleur indicated to Cargill that the MBPXL board would support the proposal. The letter further indicated that if there was mutual interest, Cargill would expect to be in a position to make a formal proposal no later than October 17, 1978, and also requested a tour of MBPXL facilities.

In the meantime, on October 5, 1978, a memo was circulated among MBPXL and ConAgra officials setting forth the timetable for the merger. The memo set the date of October 17, 1978, for distribution of the merger agreement to MBPXL's and ConAgra's directors.

By October 5, 1978, both ConAgra and Cargill were keenly aware of the other's interest in MBPXL. An internal memo circulated at Cargill on October 5 to its board of directors indicates that Cargill was aware of the ConAgra-MBPXL agreement. This memo also indicated that, in Cargill's view, MBPXL could be acquired based on a competing offer of $27 to $30 per share. Another internal memo, captioned "MBPXL

Tactics," was circulated at Cargill on October 10, 1978, outlining the presumed ConAgra selling points to MBPXL and detailing Cargill's counterpoints. A portion of this memo was specifically entitled "Strategy to cause Con Agra to drop out of the bidding." In part the memo stated: "The range of any competing offer on our part is so narrow that presumably we will only be able to make one bid. As a consequence, it should be high enough to force Con Agra out of the bidding, but should be no more than necessary to get the job done."

Throughout early October, ConAgra and MBPXL engaged in negotiations concerning the language of the merger agreement. Of particular concern to MBPXL in the drawing of the final agreement was the language concerning the right of MBPXL to consider other offers of more substance if they were to appear. The initial draft prepared by ConAgra's counsel and presented to MBPXL's general counsel contained language which "appeared to obligate the MBPXL Board to recommend a merger with ConAgra, irrespective of whether MBPXL received any other offer to merge or be acquired." Concerned about this language, Mr. Williams, MBPXL's counsel, consulted with a law firm in Houston, Texas, experienced with similar merger agreements, for suggestions on possible language which would achieve MBPXL's purpose. Using modifying language suggested by the Houston firm, Mr. Williams sent the following proposed provisions to ConAgra's counsel:

From the date hereof until the effective time of the merger, MBPXL will not, without the prior written consent of ConAgra, approve or recommend to the holders of any shares of its capital stock, any merger, consolidation, disposition of all or substantially all of its business properties or assets, any tender offer, acquisition, or other business combinations, or furnish or cause to be furnished any information concerning its business properties or assets to any party in connection with any tender offer or 'other takeover' transaction involving it, except insofar as may be required by law, *or necessary in the opinion of its counsel, Messrs. Vincent,* [sic] *Elkins, Houston, Texas, to avoid possible liability of its directors*

*or officers to the holders of its capital stock.*
(Emphasis supplied.) Messrs. La Fleur and Harper discussed this language and agreed that the emphasized provision be deleted so as not to make MBPXL's obligations rest on the determination of the Houston law firm.

Around October 14, 1978, ConAgra's counsel prepared another draft, which contained the following "no merger" clause:

> <u>No Merger.</u> From the date hereof until the Effective Time of the merger, MBPXL will not, without the prior written consent of ConAgra, approve or recommend to the holders of any shares of its capital stock, any merger, consolidation, disposition of all or substantially all of its business, properties or assets, any tender offer, acquisition or other business combination, or furnish or cause to be furnished any information concerning its business, properties or assets to any party in connection with any tender offer or other "takeover" transaction involving it, except insofar as may be required by law.

This provision was inserted because of ConAgra's desire to avoid becoming involved in a "bidding contest" for MBPXL. However, by deleting the emphasized language, the revised provision completely altered MBPXL's purpose in seeking to avoid binding its directors in the event a better offer appeared.

During the afternoon of October 16, Mr. Williams met with Messrs. Olson and Bacon of MBPXL's counsel, Shook, Hardy & Bacon. The three gentlemen agreed that the "no merger" clause was unacceptable to MBPXL. Mr. La Fleur was informed of his counsel's opinion and related it to Mr. Harper. The next day, negotiations between ConAgra and MBPXL continued. ConAgra's counsel ultimately agreed to delete the "no merger" clause and substitute instead a "best efforts" clause which read in part:

> <u>Best Efforts.</u> The respective Boards of Directors and principal officers of each of ConAgra and MBPXL shall take all such further action as may be necessary or appropriate in order to effectuate the transactions contemplated hereby including recommending to their respective shareholders that the merger be approved;

<u>provided, however,</u> *nothing herein contained shall relieve either Board of Directors of their continuing duties to their respective shareholders.*

(Emphasis supplied.) After these changes were made in the draft of the agreement, Mr. Williams went into a specially convened MBPXL board meeting. Following some discussion, the MBPXL board unanimously approved the definitive merger agreement. After the meeting Messrs. Williams and La Fleur flew from MBPXL headquarters to Omaha, where the final agreement was signed and executed.

Besides this change, the final agreement further provided:

> The Board of Directors of MBPXL will duly call and use its best efforts to cause to be held a special meeting of the shareholders of MBPXL on December 15, 1978, or the earliest practicable date thereafter, and has directed that this Agreement and the Merger Agreement be submitted to a vote at such meeting, and will recommend that the shareholders of MBPXL vote in favor of approval of this Agreement and the Merger Agreement.

During the negotiations leading up to the signing of the merger agreement, Cargill remained interested in MBPXL. On October 11, 1978, several Cargill officials toured a part of MBPXL's plant facilities. Cargill also had several discussions with its investment bankers, First Boston, regarding the acquisition. Basically, Cargill developed two strategies by which to acquire MBPXL: (1) negotiate with the major groups of MBPXL's shareholders (e.g., Marcus, Fulton, and Brown); or (2) make a cash tender offer for any and all outstanding shares.

On or about October 16, 1978, Mr. Stanton of BEDCO informed Cargill that it should be prepared to make an offer within the next 2 days, before the merger agreement with ConAgra was signed. Cargill representatives, through Mr. Weiksner, conveyed a proposal to Mr. Stanton of $30 per share if MBPXL would assume the liability, if any, for pending antitrust litigation.

This proposal, along with the October 5 letter of Mr. MacMillan to Mr. La Fleur, was considered by MBPXL's board at the October 17 special meeting. However, on the advice of Mr. Stanton and legal counsel, the board concluded that at that

time it had no firm offer from Cargill to consider.

On October 18, 1978, BEDCO released its opinion to the MBPXL board of directors that the terms of exchange for MBPXL common stock as set forth in the agreement and plan of reorganization and merger were fair and equitable to MBPXL's stockholders. On October 20 an internal memo was circulated among Cargill directors outlining "key considerations of acquiring an interest in MBPXL Corporation." The memo set forth a timetable by which Cargill would approach the major shareholders to purchase their shares; help them with potential tax problems; inform MBPXL's board, through a letter, of Cargill's interest; and shortly thereafter make a public announcement of the proposed tender offer. The memo does not, however, mention the signing of the MBPXL-ConAgra merger agreement, although it does mention as a variable to be considered in its own offer a "price which realistically preempts a competing bid by Con Agra."

Nevertheless, on October 23, 1978, Cargill's board of directors met and decided to "make no effort to acquire MBPXL at this time." This decision was not communicated to MBPXL.

Meanwhile, that same afternoon, Mr. Howard Marcus, a director and stockholder of MBPXL, called Mr. Cargill MacMillan and left a message indicating that he was a "stockholder of MBPXL." When Mr. Marcus later reached Mr. MacMillan, he told him that he was calling in his capacity as a stockholder and inquired whether Cargill still had any continuing interest in "acquiring MBPXL." Mr. Howard Marcus, his father, Samuel, and brother, Jerome, aside from their respective roles as officers and directors, were significant shareholders in MBPXL.

While Mr. MacMillan testified that, during their phone conversation, Mr. Marcus said he was representing the Marcus family, Mr. Marcus himself maintained that he was only speaking for himself and for no other member of the family. In deposition testimony Howard Marcus did not recall indicating to Mr. MacMillan that a definitive agreement between MBPXL and ConAgra had been executed. However, Mr. Marcus did agree that the merger agreement was "public knowledge."

Further, Mr. MacMillan's notes, taken during the conversation, contain a notation that read, "60 day Mid to late Dec." According to Mr. MacMillan, this note referred to "the date or the time when the ConAgra MBPXL merger would be completed." Mr. Marcus then suggested that the two get together. The purpose of such a meeting, according to Mr. MacMillan's deposition, was Cargill's acquisition of MBPXL.

Their interest in MBPXL now rekindled, four Cargill representatives met on November 1 in Wichita, Kansas, with Messrs. Howard, Jerome, and Samuel Marcus and their attorney. At this meeting Cargill's general counsel announced that the sole purpose of the meeting with the Marcus family members was "as shareholders" and not in their capacity as directors or officers of MBPXL. The Marcuses indicated that this would not present any problems inasmuch as they apparently believed the proviso to the "best efforts" clause allowed them to enter into such discussions. The parties then discussed, according to Mr. Howard Marcus, "the attributes of MBPXL as a company and the direction we were going and why we thought *the company* was worth buying." (Emphasis supplied.) The parties also discussed a selling price for the shares of stock held by the Marcuses and the possible ramifications of that price in the antitrust litigation pending against MBPXL. At the conclusion of the meeting, Cargill's representatives said they would take this latest information back to their board for further discussion.

Meanwhile, throughout late October and early November, the ConAgra-MBPXL merger continued on schedule. On October 25, 1978, MBPXL's board met to determine its representatives on the combined board of directors. From October 25 through October 29, MBPXL representatives, including Messrs. Howard and Jerome Marcus, toured ConAgra plants in Alabama and Puerto Rico as part of the "due diligence" investigation. On October 26, 1978, however, ConAgra's board, still concerned about competition, authorized the purchase of MBPXL common stock "as a hedge against a cash tender offer by a third party."

On November 7 Messrs. Calvin Anderson and Heinz Hutter of Cargill phoned Mr. Howard Marcus and said that Cargill

had "agreed in principle" to make an offer in the lower range of the price figures discussed on November 1. On November 8 a telephone conversation was held between Mr. Anderson and Mr. Blaes, the Marcus family attorney, with Mr. James Moe, counsel for Cargill, present but not participating in the conversation. During this conversation, Cargill representatives questioned Mr. Blaes about whether Mr. Howard Marcus was "uneasy about being emissary to get major shareholders together." Mr. Blaes responded affirmatively.

On November 10 attorneys for the Marcuses and Cargill met to draft agreements for the sale of MBPXL stock by the Marcuses, their relatives, and close associates. On November 13 Cargill received a copy of a list of MBPXL shareholders from the Marcuses' attorney.

On November 14 the board of directors of Cargill Holdings, Incorporated, authorized its officers to execute contracts for the purchases of MBPXL stock at $27 a share. On that same day 13 individuals, including the Marcus families, Mr. Joe Kirk Fulton, another MBPXL director, and several of their associates met with Cargill representatives and executed agreements for either the immediate or deferred purchase of their shares of MBPXL. Through these agreements, Cargill acquired outright 21.9 percent of MBPXL's outstanding shares and agreed to acquire another 4.5 percent on January 3, 1979. Cargill was prevented from acquiring through purchase agreements the entire 26 percent of stock due to limitations imposed by federal law under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. See 15 U.S.C. § 18a. (1982). The purchase agreements provided in part that Cargill would "use its best efforts to make, as promptly as practicable and in accordance with all applicable laws, a tender offer (the 'proposed tender offer') for any and all MBPXL Common not then owned by Cargill, at a price of $27.00 per share, net to the Seller in cash."

On the evening of November 14, Messrs. McVay and La Fleur met, at which time Mr. La Fleur expressed his commitment to pursue the agreement between MBPXL and ConAgra. On November 15 Cargill publicly announced the stock purchase transaction and its intention to make a tender

offer to acquire the balance of MBPXL stock.

The following day, November 16, the MBPXL board of directors met in Wichita. At this meeting the board ratified its executive committee's appointments of members to a proxy committee for the stockholders' meeting to be held concerning the ConAgra merger. The board further decided to consider Cargill's announced intention to make a $27-per-share tender offer, and toward that purpose retained BEDCO for an analysis of the two proposals. By an 11-to-1 vote the board also suspended the Marcus brothers "of all duties and responsibilities as . . . officer[s] and employee[s] of the Corporation . . . pending further investigation of their participation in activities regarding the Merger Agreement with ConAgra, Inc. and the recent proposed tender offer by Cargill, Inc."

On November 20 MBPXL representatives met with Cargill representatives and generally discussed Cargill's intent regarding the future of MBPXL, its management, and control. On November 21, as previously stated, ConAgra commenced legal action against Cargill.

On November 27 the MBPXL board met again. Mr. Stanton of BEDCO advised the board that, in his opinion, the $27 offer from Cargill was superior to the ConAgra proposal. At the direction of one of the MBPXL attorneys, the board reviewed its various options:

> 1) proceed to recommend ConAgra, Inc. merger; 2) recommend Cargill, Inc. proposed tender offer; 3) proceed with proxy, etc. and shareholders meetings and present facts of both proposals; 4) a no action position by not proceeding with the ConAgra, Inc. merger and make no recommendation regarding the Cargill proposed tender offer at this time; 5) a continued review of the Cargill, Inc. proposed tender offer because of the financial and legal advice now before the Board and in view of the present market situation.

MBPXL's board decided to pursue the fifth option.

The board also discussed its potential liability under the merger agreement to ConAgra. Following this meeting, MBPXL's officers and directors were advised by their legal

counsel not to communicate with ConAgra unless the discussions concerned an increased offer from ConAgra. Mr. La Fleur called Mr. Anderson of Cargill that day and informed him that MBPXL had "agreed to more positively pursue Cargill offer."

On November 29, just prior to the full hearing on ConAgra's request for a preliminary injunction, Cargill's investment bankers and legal advisers met with MBPXL representatives Dods, Olson, and Stanton in Minneapolis. Notes taken at this meeting reveal that the participants discussed stock options, management positions, expansion of operations, the Marcus family, indemnification, the upcoming MBPXL board meeting on December 5, and the defense of lawsuits brought by ConAgra against the Marcuses and Cargill.

On December 1 these individuals again met with Messrs. McGrory and Anderson of Cargill. The Cargill memo of this meeting stated: "Again, at the end of the discussions it was reiterated that Cargill had not made an offer nor negotiated any type of agreement with MBPXL but had merely advised the gentlemen representing MBPXL of Cargill policies and practices with respect to a number of issues."

As previously stated, on December 4, 1978, a temporary restraining order was issued against Cargill, Incorporated, and Cargill Holdings, Incorporated. Also on December 4, Mr. Harper met with MBPXL representatives to discuss ConAgra's offer vis-a-vis that of Cargill. This same day, BEDCO issued its opinion to MBPXL that the Cargill offer was superior to ConAgra's and that "the proposed tender offer of $27.00 per share affords a higher present financial benefit to MBPXL shareholders than do the proposed merger terms offered by ConAgra."

On December 5, 1978, the MBPXL board of directors met and, upon further consideration of the options presented by legal counsel, unanimously approved the following resolutions:

> "RESOLVED, that as a result of the intensive investigation undertaken by management and its financial and legal advisors and in view of the fiduciary obligation of this Board to its shareholders, this Board of Directors cannot recommend to its shareholders that they vote in

favor of the proposed merger with ConAgra, Inc.;

"FURTHER RESOLVED, that in view of this decision that the shareholders meeting originally scheduled for December 15, 1978 be cancelled;

"FURTHER RESOLVED, that management and legal counsel be authorized to negotiate with ConAgra and its legal counsel a mutual termination of the Merger Agreement dated as of October 17, 1978;

"FURTHER RESOLVED, that this Board of Directors recommend to its shareholders that they accept the offer of $27.00 per share net to seller which Cargill, Inc. has indicated it would make in the immediate future, subject to the approval of the final terms of this offer being acceptable to a committee of the Board consisting of Messrs. Rolf and La Fleur with legal consultation."

Messrs. Howard and Jerome Marcus participated in this vote. The remaining pertinent facts are as stated in the introduction of this opinion.

To determine whether the district court correctly found the defendants MBPXL and Cargill liable to ConAgra for breach of contract or tortious interference with a contract, or both, we must, at the threshold, determine what obligation, if any, a board of directors has pursuant to a merger agreement prior to its approval by the shareholders. The resolution of this question turns upon a delicate interplay of principles of both contract and corporate law, neither wholly controlling the outcome.

The appellants assert that ConAgra has no claim to the "benefits" of the bargain because consummation of the merger agreement was dependent upon and subject to the approval of the shareholders of MBPXL and ConAgra. Applicable Delaware law provides that "[t]he board of directors of each corporation which desires to merge . . . shall adopt a resolution approving an agreement of merger or consolidation" and that the agreement adopted "shall be submitted to the stockholders of each constituent corporation . . . for the purpose of acting on the agreement." Del. Code Ann. tit. 8, § 251(b) and (c) (rev. 1974). Appellants further assert that the merger agreement was an executory contract "specifically drafted to permit the MBPXL Board to fulfill its fiduciary duty to the company's

154

shareholders." Brief for Appellants at 16. We believe that the appellants are correct in that regard.

A corporate director must act in the best interests of shareholders and is obligated to the duties of "fidelity, good faith, and prudence with respect to the interests of security holders, as well as the duty to exercise independent judgment with respect to matters committed to the discretion of the board of directors and lying 'at the heart of the management of the corporation.' " *Gt. West. Prod. v. Gt. West. United,* 200 Colo. 180, 186, 613 P.2d 873, 878 (1980). These duties are applicable to a director's acts in recommending a proposed merger. See *Smith v. Van Gorkom,* 488 A.2d 858 (Del. 1985). In the context of a proposed merger, a director has a duty under Del. Code Ann. tit. 8, § 251(b), to act in an informed and deliberate manner.

In *Jewel Companies v. Pay Less Drug Stores Northwest,* 741 F.2d 1555, 1564 (9th Cir. 1984), the court of appeals recognized that "after the merger agreement is signed a board may not, consistent with its fiduciary obligations to its shareholders, withhold information regarding a potentially more attractive competing offer." See, also, *Finklea v. Carolina Farms Co.,* 196 S.C. 466, 13 S.E.2d 596 (1941).

The Securities Exchange Act of 1934 places affirmative disclosure obligations on directors in a case such as this. See, e.g., 15 U.S.C. §§ 78j(b) and 78n(d) (1982) (commonly §§ 10(b) and 14(d)).

This court should not sanction "agreements which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters." *Abercrombie, et al. vs. Davies, et al.,* 35 Del. Ch. 599, 611, 123 A.2d 893, 899 (1956), *rev'd on other grounds* 36 Del. Ch. 371, 130 A.2d 338 (1957). See, also, *Chapin v. Benwood Foundation Inc.,* 402 A.2d 1205 (Del. Ch. 1979). A danger inherent in a merger agreement which prevents submission of competing offers to the shareholders pending submission of a merger proposal is that a director might feel "bound to honor a decision rendered under the Agreement even though it was contrary to his own best judgment." *Abercrombie, supra,* 35 Del. Ch. at 610, 123 A.2d at 899.

The MBPXL board recognized the difficulty in such an agreement when it insisted upon replacing ConAgra's "no merger" clause with its own "best efforts" clause which was intended to allow MBPXL to consider competing offers. Specifically, the "best efforts" clause read:

> The respective Boards of Directors and principal officers of each of ConAgra and MBPXL shall take all such further action as may be necessary or appropriate in order to effectuate the transactions contemplated hereby including recommending to their respective shareholders that the merger be approved; provided, however, *nothing herein contained shall relieve either Board of Directors of their continuing duties to their respective shareholders.*

(Emphasis supplied.)

While the language before the proviso and the language after the proviso may be somewhat in conflict, it is clear that the parties recognized that there was a continuing fiduciary duty owed by each board of directors to its respective shareholders which could not be contracted away. In that regard we cannot imagine a greater duty owed to shareholders than advising them of the existence of a higher offer for their stock before asking them to approve a lower offer. The directors of MBPXL could not agree to assist ConAgra by pledging their best efforts if by doing so the directors of MBPXL violated their legal duties to the MBPXL shareholders. See *Gt. West.Prod., supra.* To hold otherwise would be to place innocent shareholders of a company at the mercy of corporate directors whom the shareholders rely upon for candor and fair dealing.

A director's duty to inform himself or herself in preparation for a decision derives from the fiduciary capacity in which he or she serves the corporation and its shareholders. See *Lutz, et al. vs. Boos, et al.*, 39 Del. Ch. 585, 171 A.2d 381 (1961). Since a director is vested with the responsibility for the management of the affairs of the corporation, he or she must execute that duty with the recognition that he or she acts on behalf of others. Such obligation does not tolerate faithlessness or self-dealing. See *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985). Even if the board of directors enters into a contract containing a lockup provision, the agreement must not infringe on the voting rights

of shareholders or chill the bidding process. See *Thompson, et al. vs. Enstar Corp., et al.,* No. 7641, slip op. (Del. Ch. June 20, 1984, rev. July 5 & Aug. 16, 1984) (Hartnett, V.C.).

Whether the directors of MBPXL may have breached an enforceable agreement between ConAgra and themselves which might result in their personal liability to ConAgra is a matter we do not decide. That matter is not before us. But the directors could not enter into an agreement to violate their fiduciary obligations to their shareholders and then render the company and ultimately the shareholders liable for failing to carry out an agreement in violation of the directors' duty to the shareholders. To so hold, it would seem, would be to get the shareholders coming and going.

When the MBPXL board resolved to cancel the shareholders' meeting at which the ConAgra merger proposal was to have been submitted and instead recommended shareholder acceptance of the cash-out Cargill offer, that was not a breach of the ConAgra merger agreement. Once the directors of MBPXL learned of the competing Cargill offer, the "best efforts" clause in the ConAgra proposal could not relieve the MBPXL directors of their duties to act in the shareholders' best interests. They had an obligation at that point to investigate the competing offer, and if, in the exercise of their independent good faith judgment, they found that the Cargill offer was a better offer for the MBPXL shareholders, they were bound to recommend the better offer. *Gt. West. Prod. v. Gt. West. United,* 200 Colo. 180, 613 P.2d 873 (1980).

The MBPXL board's decision to investigate the Cargill tender offer was not a ratification of the Marcuses' acts as independent shareholders in seeking a better price for their shares. The board was obligated by its fiduciary duties to the shareholders to investigate the Cargill tender offer. *Gt. West. Prod., supra.*

The MBPXL board was without statutory power to bind the corporation to the proposed ConAgra merger absent shareholder approval. Del. Code Ann. tit. 8, § 251(c). Several courts have held that analogous agreements are without binding legal effect absent shareholder approval. In *Finklea v. Carolina Farms Co.,* 196 S.C. 466, 13 S.E.2d 596 (1941), the

court denied specific performance of an option agreement, which was subject to shareholder approval, to purchase the defendant company's land. The shareholders indicated that they would not approve the plaintiff's offer after they received information of a better offer from the defendant company's management. The court denied relief after concluding that the option agreement was not binding absent shareholder approval and that the agreement had not relieved management of its fiduciary obligation to inform the shareholders of a better offer.

Similarly, in *Masonic Temple, Inc., et al. v. Ebert*, 199 S.C. 5, 18 S.E.2d 584 (1942), the court denied specific performance to the plaintiff corporation which had contracted to sell substantially all of its property to the defendant, subject to shareholder approval. The defendant sent a letter canceling the transaction prior to the shareholder meeting, after learning that misrepresentations had been made about the property. Shareholder approval of the sale was obtained nevertheless. The court held that absent shareholder approval the agreement was a mere offer to sell, and the defendant, therefore, had a right to withdraw the offer until a contract was formed by shareholder acceptance. See, also, *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F. Supp. 597 (S.D.N.Y. 1971); *Smith vs. Good Music Station, et al.*, 36 Del. Ch. 262, 129 A.2d 242 (1957).

In holding that the plaintiff had enforceable rights in the October 17 agreement even without shareholder approval, the appellee relies on *Mid-Continent Telephone Corp. v. Home Telephone Co.*, 319 F. Supp. 1176 (N.D. Miss. 1970). The *Mid-Continent* court held that the merger agreement between the plaintiff and the defendant was valid and binding. Damages for breach of the contract were awarded. The *Mid-Continent* case is, however, distinguishable. The court in *Mid-Continent* recognized that the defendant corporation was closely held and that informal shareholder approval had been obtained. In effect, the court held that the formal requirements had been waived by the shareholders. Also, none of the conditions which the defendant claimed were precedent to the formation of a binding contract involved shareholder approval. In the present

case the ConAgra merger agreement was never formally or informally approved by the shareholders.

Under the circumstances in this case, the MBPXL board's fiduciary duties obligated it to withdraw its recommendation of the ConAgra proposal. *Gt. West.Prod., supra.*

Furthermore, it would appear that the evidence, such as it is, would have required the trier of fact to engage in speculation regarding the question of whether any action not taken by the board of directors of MBPXL could have been the proximate cause of any loss sustained by ConAgra. It is difficult to imagine that, presented the facts, the stockholders of MBPXL would have accepted the offer. Because, however, we have determined there was no liability, we need not address that issue further.

The plaintiff's motion for summary judgment should have been overruled, the defendants' motion for summary judgment sustained, and the petition dismissed.

REVERSED AND REMANDED WITH DIRECTIONS.

WHITE, J., dissenting.

The majority opinion ignores basic principles of contract law which, if properly integrated with statutory corporate law, would have resulted in a partial affirmance of the district court's order. A "suitor" corporation now has no contractual rights with respect to actions by the board of a "target" corporation, despite agreements, as here, pledging only that the target's board of directors will use its best efforts to promote the merger with its shareholders. Because I do not agree with the majority's selective application of the law, I dissent.

At the height of negotiations between ConAgra and MBPXL, the latter proposed a "best efforts" clause for inclusion in the agreement. This clause reads:

> The respective Boards of Directors and principal officers of each of ConAgra and MBPXL shall take all such further action as may be necessary or appropriate *in order to effectuate the transactions contemplated hereby including recommending to their respective shareholders that the merger be approved*; provided, however, nothing herein contained shall relieve either Board of Directors of their continuing duties to their respective shareholders.

(Emphasis supplied.)

The agreement also states:

> The Board of Directors of MBPXL will duly call and use its best efforts to cause to be held a special meeting of the shareholders of MBPXL on December 15, 1978, or the earliest practicable date thereafter, and has directed that this Agreement and the Merger Agreement be submitted to a vote at such meeting, and will recommend that the shareholders of MBPXL vote in favor of approval of this Agreement and the Merger Agreement.

The MBPXL Corporation breached the promises contained in both paragraphs. The majority holds that the promisee is afforded no relief for those breaches. The majority mentions an inconsistency between the language before and after the proviso in the "best efforts" clause; however, a balanced application of contract and corporate law yields no inconsistency, and it respects the viability of both the business judgment rule and the duty of due care.

The language of the agreement allows the boards of both corporations seeking to merge or reorganize to enter into a binding contract governing the conduct of the parties pending submission of the agreement to the shareholders for approval. To view the language as the majority does circumscribes the role of corporate boards of directors in contravention of their traditional management function, the exercise of their business judgment. There is nothing unique about the decision to enter into a negotiated merger transaction that would warrant its removal from the realm of ordinary business affairs of the corporation, the management of which is entrusted to the board of directors. Indeed, consistent with its fiduciary duties, a board of directors is in the best position to provide guidance for shareholders of a corporation considering a buy-out or merger.

To adhere to the majority's position also ignores principles of contract law. A contract of this sort is properly interpreted as a binding agreement indicating a present undertaking, with the parties contemplating the satisfaction of certain further conditions before a duty to perform arises. *Mid-Continent Telephone Corp. v. Home Telephone Co.*, 319 F. Supp. 1176

(N.D. Miss. 1970). The critical distinction between this interpretation and that of the majority is the difference between a condition precedent which must be performed before the agreement of the parties becomes a binding contract and one which must be fulfilled before the duty to perform an existing contract arises. *Mid-Continent, supra.* See, also, *Omaha Public Power Dist. v. Employers' Fire Insurance Co.*, 327 F.2d 912 (8th Cir. 1964); Restatement (Second) of Contracts §§ 224-226 (1981).

The majority's interpretation does not agree with the language of the agreement at issue. Paragraph 9 of the "Agreement and Plan of Reorganization and Merger" provides:

> Conditions Precedent to Obligation of ConAgra. The obligation of ConAgra to perform and observe the covenants, agreements and conditions hereof to be performed and observed by ConAgra at or before the Effective Time of the Merger, and to effect the Merger, shall be subject to the satisfaction of the following conditions, which conditions may be waived in writing by ConAgra: . . . .

One of the conditions listed below this clause was the following: "MBPXL Shareholder Approval. . . . [T]he Merger Agreement shall have been approved by the shareholders of MBPXL as provided in the Delaware General Corporation Law." I interpret the conditions precedent in this agreement to mean those conditions which must be satisfied before the duty to perform on an existing contract arises, and not as conditions which must be satisfied before a binding contract exists at all.

The majority relies on case law either quoted out of context or entirely inapposite to the facts and law at issue. The majority uses *Gt. West. Prod. v. Gt. West. United*, 200 Colo. 180, 613 P.2d 873 (1980), in support of the proposition that a corporate director must act in the best interests of shareholders and is obligated to the duties of "fidelity, good faith, and prudence with respect to the interests of security holders, as well as the duty to exercise independent judgment with respect to matters committed to the discretion of the board of directors and lying 'at the heart of the management of the corporation.' "

*Gt. West.Prod., supra* at 186, 613 P.2d at 878. The majority also relies on that case for the proposition that directors of a target company cannot agree to assist the suitor company by pledging their best efforts if by doing so the directors of the target company violate their legal duties to target's stockholders. Finally, the majority asserts that *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985), makes these duties applicable to a director's acts in recommending a proposed merger.

In *Gt. West.Prod., supra*, the Supreme Court of Colorado was required to interpret the obligations imposed by a "best efforts" clause. Great Western Producers Co-operative had agreed to buy all the stock of Great Western Sugar Company, a wholly owned subsidiary of Great Western United Corporation. Pursuant to lengthy negotiations, United and the co-op executed a purchase agreement, which was unanimously approved by United's board of directors. Because the sugar company was United's major asset, Delaware law required that the sale be approved by the corporation's stockholders. A clause in the agreement stated that "United will use its best efforts to obtain the approval of its shareholders and debentureholders whose approval is solicited." *Gt. West.Prod., supra* at 182, 613 P.2d at 875.

During the interval between the execution of the agreement and the shareholders' meeting, the price of sugar, the seller's principal commodity, rose dramatically. Considering the effect of this price change on the value of the corporation, United's board of directors informed its shareholders that it could no longer recommend the sale at the agreed price. The shareholders' meeting was held, and the sale failed due to insufficient votes. The co-op then sued for breach of the "best efforts" clause.

The Colorado Supreme Court concluded that the parties

did not intend that the "best efforts" clause would impose on United's board of directors any obligation which would conflict with the directors' legal duties to the corporation's security holders. These duties include fidelity, good faith, and prudence with respect to the interests of security holders, as well as the duty to exercise independent judgment with respect to matters committed to the

discretion of the board of directors and lying "at the heart of the management of the corporation." (Citations omitted.) *Gt.West.Prod. v. Gt.West.United*, 200 Colo. 180, 186, 613 P.2d 873, 878 (1980). The court affirmed the decision of the state court of appeals, which had held:

(1) the purchase agreement required United to exercise only its "best lawful efforts" to obtain security holder approval of the sale of the Sugar Company; (2) both federal and state law obligated United and its board of directors "to inform the security holders that, because of the change of circumstances [*i.e.*, the increases in sugar prices and profits and the corresponding increase in the value of the Sugar Company], they believed the terms for the sale of the Sugar Company were no longer fair and equitable"; and (3) the September 14, 1974, reversal in the recommendation of United's board of directors to its security holders could not therefore constitute evidence of a breach of the "best efforts" clause.

*Id.* at 184-85, 613 P.2d at 877. In determining that United's board of directors had not breached the "best efforts" clause, the Colorado Supreme Court reasoned:

The "best efforts" obligation required that United and its board of directors make a *reasonable, diligent, and good faith effort to accomplish a given objective, viz.*, security holder approval of the purchase agreement. The obligation, however, must be viewed in the context of unanticipated events and the exigencies of continuing business development and cannot be construed to require that such events and exigencies be ignored or overcome at all costs. In short, the "best efforts" obligation was tempered by the directors' overriding duties under sections 141(a) and 271(a) of the "General Corporation Law of the State of Delaware."

(Emphasis supplied.) *Id.* at 186-87, 613 P.2d at 878-79. The court further found that the directors had "inquired into changed circumstances and determined, pursuant to the exercise of their independent good faith judgment, that the terms of the purchase agreement were no longer in the security holders' best interests." *Id.* at 187, 613 P.2d at 879.

*Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985), is inapposite on its facts alone. Van Gorkom was a corporate director engaged in negotiating a merger agreement without the knowledge or participation of the other board members. After the buy-out, which was recommended by the board and approved by a majority of the shareholders, the shareholders brought a class action suit, originally seeking rescission of the merger. The class sought alternative relief in damages against individual members of the board, the new corporation, and owners of the parents of the new corporation.

At issue in *Van Gorkom* was the liability of individual directors who failed to inform themselves and the stockholders of all information available and relevant to the proposed merger. The directors relied on the business judgment rule to validate their actions. Nevertheless, the court found that, under the circumstances, the directors were individually liable because they failed to inquire into the particulars of Van Gorkom's merger and because they failed to disclose, and in fact were not able to disclose, all material information that a reasonable stockholder would consider important in deciding whether to approve the offer. In an exacting look at the business judgment rule, the court determined that the directors had not fulfilled their fiduciary duty of due care and had failed to satisfy virtually every element of the business judgment defense.

A board of directors blindly following the lead of one director to the ultimate detriment of all shareholders is a far cry from the facts in this case. *Van Gorkom* dealt with a board wholly uninformed and apparently uninterested in the terms of the merger agreement. Nevertheless, it recommended the merger to the shareholders, and the shareholders followed the advice.

In this case all MBPXL directors were aware of the ConAgra proposal and participated in constructing the final agreement. The MBPXL board deprived its shareholders of the opportunity to decide which was the superior offer when it canceled the promised shareholders' meeting. Had the MBPXL board used its best efforts to hold the meeting, then, as required by Delaware law, the shareholders could have compared the merger terms and selected the superior arrangement. Indeed,

even if the MBPXL directors, pursuant to their fiduciary duties and statutory obligation to determine in an informed and deliberate manner whether to recommend the merger before submitting the proposal to stockholders, Del. Code Ann. tit. 8, § 251(b) (rev. 1974), had ultimately recommended Cargill's terms over ConAgra's, the board still would have been adhering to the terms of the "best efforts" clause.

This was precisely the situation in *Gt.West.Prod. v. Gt.West.United*, 200 Colo. 180, 613 P.2d 873 (1980), and in another case cited by the majority, *Jewel Companies v. Pay Less Drug Stores Northwest*, 550 F. Supp. 770 (N.D. Cal. 1982), *rev'd* 741 F.2d 1555 (9th Cir. 1984). In *Jewel* the plaintiff, Jewel Companies, Inc., and its subsidiary, Jewel Acquisition Corporation, entered into a merger agreement with Pay Less Drug Stores of Oakland, California (Pay Less Oakland). The agreement in *Jewel*, as in the instant case, provided for a tax-free exchange of stock and for the directors of Pay Less Oakland to use their "best efforts" to complete the merger. After the Jewel-Pay Less Oakland agreement was publicly announced, Pay Less Drug Stores Northwest (Pay Less Northwest) sought to acquire Pay Less Oakland through a competing cash tender offer. Because the Pay Less Northwest offer was worth more per share, $24 versus $14.75, Pay Less Oakland signed an agreement with Pay Less Northwest. Jewel failed to increase its offer, and Pay Less Oakland's board of directors unanimously recommended to its shareholders that they accept Pay Less Northwest's tender offer. The board's recommendation was placed before its shareholders along with a complete history of the two offers and relevant factors in the board's decision. Jewel then brought an action against Pay Less Northwest for tortious interference with contract.

The federal district court rejected the plaintiff's claims and granted the defendant's motion for summary judgment, commenting:

> While it is true that the Oakland Board of Directors agreed to use their best efforts to complete the merger, it is also true that Jewel and its shareholders did not have then, and do not have now, an unequivocal right to the benefits of the merger. The power to approve the merger rested

with the Oakland shareholders, and the Jewel agreement imposed no duty on those shareholders to ratify the merger agreement.

*Jewel, supra,* 550 F. Supp. at 772. The court went on to find that the merger agreement itself was not a binding contract, since the shareholders, as offerees, were the only parties with the power to accept the contract. *Jewel, supra,* 550 F. Supp. 770. The court further commented that "[t]he marketplace is the proper forum to resolve competing tender offers." *Jewel, supra,* 550 F. Supp. at 773.

The ninth circuit reversed the holding of the district court in *Jewel.* In its decision the court of appeals first held that under the California Corporate Code the boards of directors of two corporations seeking to merge or reorganize "may enter into a *binding merger agreement governing the conduct of the parties pending submission of the agreement to the shareholders for approval.*" (Emphasis supplied.) *Jewel, supra,* 741 F.2d at 1561. California's corporate code is quite similar in this regard to that of Delaware, the only difference being that board approval of the agreement need not necessarily precede shareholder approval. Cal. Corp. Code § 1001(a)(2) (West 1977). See Del. Code Ann. tit. 8, § 251.

The ninth circuit also held that, pending shareholder approval, a board may bind itself in limited areas to exert its best efforts to consummate a merger. Without delineating the full scope of a board's "best efforts" obligation, the court determined that the term does "include at a minimum a duty to act in good faith toward the party to whom it owes a 'best efforts' obligation." *Jewel, supra,* 741 F.2d at 1564 n.11. According to the court:

> The board can bind the corporation temporarily with provisions . . . which essentially require the board of the target firm to refrain from entering any contract outside the ordinary course of business or from altering the corporation's capital structure. Such provisions are intended, essentially, to preserve the status quo until the shareholders consider the offer.

*Jewel, supra,* 741 F.2d at 1564 n.12.

Like Cargill and MBPXL, the appellees in *Jewel* argued that

any contractual obligations a board of directors may have are always subject to its higher fiduciary duties to the shareholders of the corporation. The district court in *Jewel* had held that California corporate law mandated that corporate directors observe high standards of fiduciary duty with respect to shareholders, and when presented with another offer, the directors had a duty to compare the two offers and recommend the more attractive offer to the shareholders. *Jewel, supra,* 550 F. Supp. 770. However, the district court specifically reserved the question of whether the board of directors' fiduciary obligation required it to "*affirmatively* seek out other offers." *Jewel, supra,* 550 F. Supp. at 773 n.1.

In reversing the district court's decision, the ninth circuit acknowledged the validity and importance of fiduciary duties but concluded that a board may bind itself in a preapproval merger agreement without violating those duties. At the outset the circuit court recognized that a corporate board of directors "may not lawfully divest itself of its fiduciary obligations in a contract." *Jewel, supra,* 741 F.2d at 1563 (citing *Gt. West.Prod. v. Gt. West.United,* 200 Colo. 180, 613 P.2d 873 (1980)). The court also acknowledged the fact that "[e]ven after the merger agreement is signed a board may not, consistent with its fiduciary obligations to its shareholders, *withhold* information regarding a potentially more attractive competing offer." (Emphasis supplied.) *Jewel, supra,* 741 F.2d at 1564 (citing *U.S. Smelting, Refining, and Mining Co. v. Clevite Corp.,* [1969-1970 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,691 (N.D. Ohio 1968)). The circuit court also recognized:

> The shareholders retain the ultimate control over the corporation's assets. They remain free to accept or reject the merger proposal presented by the board, to respond to a merger proposal or tender offer made by another firm subsequent to the board's execution of exclusive merger agreement, or to hold out for a better offer.

*Jewel, supra,* 741 F.2d at 1564. Nevertheless, the circuit court concluded that, consistent with its fiduciary duties and pending shareholder approval, a board may bind itself in limited areas to exert its best efforts to consummate a merger.

The majority further suggests that the record would not

support an award of damages to ConAgra in any event because there was no evidence of proximate cause. ConAgra brought its cause of action against Cargill under a theory of tortious interference with the ConAgra-MBPXL contract, an intentional tort. To find Cargill liable for intentionally interfering with the ConAgra-MBPXL merger agreement, it must be shown that the actions of Cargill caused the interference and the loss. Prosser and Keeton on the Law of Torts, *Economic Relations* § 129 (5th ed. 1984) (interference with contractual relations). Causation with respect to intentional torts does not involve considerations of foreseeability or reasonableness, as is the case with proximate cause. See Restatement (Second) of Torts § 870, comments *c.* and *d.* (1979). As a general principle, liability for intended consequences will be found if the conduct of the party who intentionally causes the injury or loss is generally culpable and not justifiable under the circumstances. The Restatement, *supra* § 870.

Whether a defendant's actions will be considered the legal cause of a plaintiff's loss turns on more than the mere fact that the defendant has reaped the advantages of the broken contract. The defendant must have played a material and substantial role in causing the plaintiff to lose the benefits of the contract. Prosser and Keeton, *supra*. A defendant is considered to have actively participated in causing the breach of contract and the resulting damages when the defendant holds out to the third party incentives suggesting a better price or better terms. *Pure Milk Ass'n v. Kraft Foods Co.*, 8 Ill. App. 2d 102, 130 N.E.2d 765 (1955); *Cumberland Glass Mnf'g Co. v. DeWitt*, 120 Md. 381, 87 A. 927 (1913), *aff'd* 237 U.S. 447, 35 S. Ct. 636, 59 L. Ed. 1042 (1915).

Normally, it is a question of fact whether a defendant has played a material and substantial role in causing a plaintiff's loss of benefits of a contract. Prosser and Keeton, *supra*. Following the district court's entry of the partial summary judgment, a pretrial conference was held, and the district court concluded that the question of causation was among those issues remaining for trial.

The evidence presented at trial on this issue is enlightening,

considering that it consisted in part of testimony from Cargill's own expert witness. When asked by plaintiff's counsel to assume that the merger agreement had been executed and recommended by the boards and that no other party had made an intervening tender offer, whether the merger agreement would have gone through, Cargill's expert responded, "In my opinion it would have been overwhelmingly approved and would have gone through."

This testimony is consistent with that of ConAgra's expert witness, Mr. Peter Kennedy, and MBPXL's president, Mr. David La Fleur. Mr. Kennedy testified that, in his opinion, had the MBPXL shareholders been presented in December 1978 with the choices of tendering their shares for $27 each, exchanging their shares for shares of ConAgra stock pursuant to the agreement, or retaining their stock and doing nothing, the stockholders would have opted for ConAgra's terms because they offered the highest economic value. Similarly, Mr. La Fleur testified that, in his independent judgment, ConAgra's terms were better than Cargill's, in part because of tax ramifications of a cash deal. Mr. La Fleur also testified that in his discussions with other board members, none seemed to believe that Cargill's cash arrangement was worth more to MBPXL shareholders than the ConAgra shares would be after the merger with MBPXL.

In a de novo review where evidence is in conflict, this court gives weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts over the other. *Chalupa v. Chalupa*, 220 Neb. 704, 371 N.W.2d 706 (1985). Here, there is ample evidence to support the district court's finding that Cargill's interference in the contractual relations of ConAgra and MBPXL caused the breach and ConAgra's damages.

Based upon the majority's sweeping declaration of a board's fiduciary duties to its stockholders, it now appears that merger agreements, no matter how carefully drawn, are at best mere formalities, with no legal effect.

I agree with the statement in *Jewel Companies v. Pay Less Drug Stores Northwest*, 741 F.2d 1555, 1568-69 (9th Cir. 1984), which reads:

It is nowhere written in stone that the law of the jungle must be the exclusive doctrine governing sorties into the world of corporate mergers. The legitimate exercise of the right to contract by responsible boards of directors can help bring some degree of much needed order to these transactions.

SHANAHAN and GRANT, JJ., join in this dissent.